451 So.2d 48 (1984)
STATE of Louisiana
v.
John MORAN.
No. KA 1479.
Court of Appeal of Louisiana, Fourth Circuit.
May 10, 1984.
Writ Denied September 14, 1984.
*50 Dwight Doskey, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Joanne C. Marier, Asst. Dist. Atty., New Orleans, for plaintiff-appellee.
Before SCHOTT, BYRNES and WARD, JJ.
SCHOTT, Judge.
Defendant was convicted of second degree murder in violation of LSA-R.S. 14:30.1 and sentenced to the mandatory life term at hard labor.
The victim, Janelle Cuccia, was stabbed in her bedroom at about midnight on December 8, 1982. She staggered out of the house and collapsed on the front steps of her neighbor who occupied the other side of this double house. The neighbor had heard a commotion on Cuccia's side and called the police who arrived soon after her call. Either simultaneously with the arrival of the police or shortly thereafter Dr. John Knox, a physician, arrived on the scene, and along with police emergency medical personnel he rendered emergency treatment to Cuccia who was bleeding profusely from her neck. She was taken to Charity Hospital where she died a short time later.
Knox had been dating Cuccia for several months and had gone out with her on the evening of December 7. He testified that they were in her bed when her phone rang. She answered, told the caller to leave them alone, and told Knox the caller was the defendant. Knox also testified as follows: He had begun dating Cuccia several months before the murder, and, on the evening of October 6, 1982, when he and Cuccia were in her bed there was a telephone call. Cuccia unplugged the telephone saying it was a former boy friend who was harassing her. Several minutes later the defendant burst into the house and into the bedroom brandishing a pistol. When Cuccia ordered him out he struck her, threatened Knox, and left, breaking glass on the way out. Shortly after he left Knox heard a gun shot.
Because of the October incident and continuing harassment afterward, Knox got nervous and left when the telephone call came on December 7. When he drove off he was followed by an automobile he thought was defendant's. After driving around a few minutes the following car disappeared and Knox drove past Cuccia's house, which appeared to be as he left it. He went to a service station for gas and then to his own home, but after a few minutes he became concerned for Cuccia and returned to her house after arming himself with a knife and a shot gun. This time he saw a car he thought to be defendant's parked across from her house and thought "something had changed" about the house. He pulled behind the parked car, took the license number, and drove toward a nearby coffee shop where he had just seen a police car. However, this car was now gone, so he went back to Cuccia's house and found the police on the scene.
When the police learned from Knox of defendant's involvement they went to defendant's house which was a short distance away, arriving there at about 2:15 AM. Defendant was a police officer himself and was acquainted with the lead detective and some of the others involved in the investigation. When they informed him that Cuccia had been attacked he seemed upset, and they asked him if he could account for his whereabouts at the time of the crime. He stated that he had been drinking at the Parkway Tavern after getting off work as a horse mounted patrolman and then went *51 to the police stable to check his horse. Subsequent investigation disclosed that defendant had been in the tavern with several fellow officers until about 11:30 PM when he left. He was wearing a white T-shirt, gray sweat pants, and a blue windbreaker. However, when police personnel saw defendant at the stables at about 12:15 AM, he was wearing a black baseball jersey and white shorts. The detectives also interviewed Knox who was at the police crime lab and learned that he had seen defendant's car on the scene, taking down the license number which proved to be defendant's. After getting this information the detectives returned to defendant's house at about 6:45 AM. In the meantime the detectives had asked a close friend of defendant's, Officer McCord, to stay with him.
When the detectives told defendant Cuccia had died, he broke down and cried. They proceeded to interview him, asking what he was wearing when he was at the tavern. Defendant told them a white T-shirt, gray sweat pants, and blue windbreaker and stated that these clothes were in a pile of clothing in the kitchen. At the top of the pile was a blue windbreaker which appeared to be stained with fresh blood. With defendant's permission and assistance the house was searched for the shirt and pants, but they were not found. Defendant told the detectives that he had returned to his home after leaving the tavern and changed clothes intending to go jogging.
Police technicians established that the fresh blood stains on the jacket were type O, which matched Cuccia's and was shared by one percent of the population. There were also some stains on the inside of the jacket which were type A, defendant's type, shared by forty percent of the population.
It was established that the distances between the various points involved, i.e., defendant's home, the tavern, the victim's home, and the police stables, are all short and capable of being covered in an automobile in a few minutes.
Two days later, defendant's sister, who had his automobile, was asked to bring it to the police. She did so and asked the police if they would assist her in removing defendant's personal property from the vehicle. When the console was opened, a buck-type knife was discovered whereupon the police held up their search and obtained a search warrant before proceeding. Expert testimony established that this type of knife could have inflicted the wounds found on the victim.
Defendant testified and denied having committed the crime. He stated that he had worn a blue windbreaker to the tavern, came home and changed clothes intending to go jogging with his dog, but decided instead to go to the stables. Asked whether the jacket in evidence was his he said it looked like his but wasn't necessarily the same one. He admitted a close relationship with Cuccia of six years duration and stated that he had discovered her in bed with Knox in October. Although this upset him he denied having the gun at the time or threatening Knox. By the time of the murder he was going with a new girl and he stated that Cuccia's involvement with Knox was not of great concern to him.
Cuccia's brother testified in rebuttal that after the October incident, defendant had often expressed his displeasure over Cuccia's involvement with Knox.

ASSIGNMENT OF ERROR 1
By this assignment defendant contends that the trial court erred in denying his motion to suppress the knife recovered from his car because the knife's original discovery was improper so that reference to it in the affidavit for the search warrant was also improper. Defendant contends that the original discovery of the knife was improper because defendant's sister had no standing or authority to permit a search of his automobile. However, the facts do not support this position. The officers were not searching the vehicle when they discovered the knife. They were assiting the sister, at her request, in the removal of personal property. When the knife was *52 seen it was not seized and no further action was taken until a warrant was issued. Thus, there appears to be no justification for excluding this information from the affidavit.
The affidavit contained these factual assertions: 1) The car was seen in front of the victim's home just before she was fatally stabbed; 2) the car's owner was arrested for the murder; 3) a buck-type knife was observed in the car's console.
The affidavit was sufficient to support the issuance of the warrant because it supplied enough reliable information to enable the magistrate to make a practical, common sense decision that evidence would be found in the car and that probable cause to search for that evidence existed. The totality of circumstances indicated a fair probability that evidence would be found in the car. Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); State v. Lingle, 436 So.2d 456 (La.1983). Thus, the motion to suppress was properly denied, and this assignment lacks merit.

ASSIGNMENT OF ERROR 2
By this assignment defendant asserts that his motion to suppress the jacket recovered from his home was erroneously denied.
At the outset we note that defendant waived this objection by categorically stating in a memorandum in support of his motion to suppress the knife recovered from his car that he "... acknowledges that the search at his residence was with his consent and is, therefore, not at issue." Nonetheless, a reading of the testimony of the detectives and Officer McCord at the hearing and at trial compels the conclusion that defendant consented to the search. There is no evidence that consent was obtained by fraud or duress. The trial court's conclusion that defendant freely and voluntarily consented to the search is to be given great weight by a reviewing court. State v. Edwards, 434 So.2d 395 (La.1983). This assignment is without merit.

ASSIGNMENT OF ERROR 3
By this assignment defendant contends that the trial court erred in denying his motion to suppress statements he made to the investigators at his apartment on the ground that he was not given his constitutional warnings. These statements include telling the officers 1) he had worn a blue windbreaker that evening, 2) where to find the jacket, 3) the jacket was his, 4) the blood on the jacket was his own from a previous accident, and 5) he was not near Cuccia's house that evening.
In State v. Menne, 380 So.2d 14 (La.1908) the court held that constitutional warnings must be given whenever the circumstances reasonably indicate that the defendant has been deprived of his freedom in any significant way. Whether the detention is significant is determined objectively from the totality of circumstances and factors relevant to the determination include 1) whether the police officer had reasonable cause under C.Cr.P. Art. 213(3) to arrest the interrogee without a warrant; 2) whether defendant is the focus of the investigation; 3) whether the officer subjectively intends to arrest defendant; and 4) whether the interrogee believes objectively that he was being detained. State v. Thompson, 399 So.2d 1161 (La.1981).
A reading of the testimony taken at the hearing on the motion to suppress defendant's statements and at trial decisively precludes the conclusion that defendant was in any sense detained or deprived of his freedom when he made the statements in question.
When the detectives first spoke to him they had only a verbal statement from Knox incriminating defendant. Knox himself was the prime suspect at this time, and the officers were interested in clearing their brother policeman. They left McCord with him, not to restrict or detain him, but to comfort him. The officers uniformly testified that defendant appeared genuinely upset over the attack on his former girl friend.
*53 When the officers returned and confronted defendant with the change of clothes situation he may have become the focus of the investigation, but there is nothing in the detectives' testimony to suggest that they had reasonable cause to arrest defendant until the jacket was produced by him. Moreover, until this point, it seems that they were sincerely trying to help defendant with his alibi. The only statement he made after the jacket was found was that the blood on it was his own from a previous accident. To exclude this spontaneous remark because the police failed to give him Miranda warnings in this fluid, developing situation would constitute a nit-picking, after-the-fact, unrealistic appraisal of the circumstances.
Furthermore, even if taken in violation of his rights, the admission of defendant's final statements to the officers was harmless error because they were accompanied by admissible statements of an equal or greater inculpatory nature, namely, those made before the jacket was found to contain fresh blood stains. State v. Mitchell, 437 So.2d 264 (1983).
Mitchell also reiterated the rule that the admissibility of inculpatory statements is a fact question for the trial judge, whose rulings on the credibility of witnesses are not to be overturned by an appellate court unless unsupported by the evidence. In the present case the trial judge, after seeing and hearing this defendant's brother officers and friends testify, believed they were trying to help him and had not begun questioning him as a suspect in the murder. We conclude that the state met its burden to show affirmatively that defendant's statements were given freely and voluntarily and not under the influence of fear, duress, intimidation, menace, threats, inducements, or promises.
This assignment is meritless.

ASSIGNMENT OF ERROR 5
By this assignment defendant contends he was entitled to a mistrial because he was not advised in advance of trial that laboratory tests on some of the blood stains on the jacket revealed that they were type A, his own type. Assuming that this information should have been revealed by the state and that the evidence should have been excluded, this was harmless error at worst because the evidence proved nothing not already proved beyond a reasonable doubt, i.e., that the jacket was defendant's. Defendant pointed the jacket out to his brother officers and told them the blood was his from a previous accident. Defendant depends on speculation to support his claim that the lab report is the only evidence tying him to the jacket. He would have this court believe that it is reasonable to hypothesize that Knox or someone else planted this jacket in his clothes pile after getting the victim's blood on it while defendant was at the tavern and that Knox, or whoever, would have the ingenuity to know that defendant was wearing such a windbreaker at the tavern on the night of the murder and would be changing it, and could plant one with the same brand name and size as defendant's. We do not find this to be a reasonable hypothesis.
The importance, if not the sole significance, of the lab report was that it contained fresh blood stains of Cuccia's comparatively rare type. The evidence that it also contained defendant's type of blood added nothing to what the jury already knew. The record establishes that the state's failure to disclose did not create prejudice causing the jury to reach the wrong conclusion. State v. Ray, 423 So.2d 1116 (La.1982).
This assignment lacks merit.

ASSIGNMENT OF ERROR 6
By this assignment defendant argues that it was reversible error for the court to allow Knox to testify that Cuccia told him it was defendant calling her on the telephone on the night of the murder. This assignment lacks merit because defendant failed to object to the testimony as required by C.Cr.P. Art. 841.

ASSIGNMENT OF ERROR 7
By this assignment defendant contends that the evidence was insufficient to support *54 a conviction because it failed to exclude every reasonable hypothesis of defendant's innocence as required by R.S. 15:438. He argues that it is reasonable to hypothesize that Knox committed the murder and planted the coat in defendant's clothes pile.
It is our task as a reviewing court to determine whether viewing the evidence in the light most favorable to the state, a rational trier of fact could have concluded beyond a reasonable doubt that every reasonable hypothesis of defendant's innocence has been excluded. State v. Austin, 399 So.2d 158 (La.1981). The most that can be said for the theory that Knox was the murderer is that it was a remote possibility. While his movements from the time he left Cuccia until the police arrived on the scene of the crime were somewhat bizarre, while his immediate reaction upon discovering the crime is in dispute, while his medical treatment of Cuccia was questioned by one of the police medical technicians and while his attitude when questioned by the police was described as belligerent, there is absolutely nothing to suggest a motive on his part for the murder. And to make his commission of the crime a reasonable hypothesis would require accepting as reasonable Knox's planting the jacket as discussed above concerning assignment 5. The hypothesis that Knox committed the murder is especially weak when contrasted with the strength of the evidence against defendant who was proved to have a motive, presence of his car on the scene, clothing with the victim's fresh blood on it, and the means to commit the crime. This assignment has no merit.
We have reviewed this record for errors patent and find none.
The conviction and sentence are affirmed.
AFFIRMED.