621 So.2d 1203 (1993)
STATE of Louisiana
v.
Steven GARNER and Glenn Garner and Harold Lyons.
No. 92-KA-1937.
Court of Appeal of Louisiana, Fourth Circuit.
July 15, 1993.
*1204 Harry F. Connick, Dist. Atty. of Orleans Parish, Jack Peebles, Asst. Dist. Atty. of Orleans Parish, New Orleans, for plaintiff/appellee.
George A. Guidry, New Orleans, for defendant/appellant.
Before KLEES, BYRNES and WALTZER, JJ.
WALTZER, Judge.
On December 27, 1990, defendants Steven Garner and Glenn Garner and a co-defendant, Harold Lyons, were each charged by grand jury indictment with second degree murder of Tommy Gilmore.[1] The defendants entered pleas of not guilty on January 16, 1991. A twelve member jury found them guilty as charged on June 11, 1992. On June 19, 1992, they were each sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. On that day, each defendant filed a motion for appeal.
Taunya Joshua testified that in the early morning hours of November 6, 1990, she and her boyfriend, the victim Tommy Gilmore, were at a bar. Elton "Plum" Clayton slapped Lynn Smith, girlfriend of Steven Garner, on the behind. The victim, Tommy Gilmore, then punched Glenn Garner. Glenn Garner, Steven Garner and Harold Lyons then left the bar. Twenty minutes later, Joshua saw the three men circling the block. Glenn Garner drove while Steven Garner and Harold Lyons sat in the passenger seat and back seat, respectively. *1205 Forty minutes later, Glenn Garner came into the bar and told Gilmore to step outside so they could fight. When Gilmore opened the door of the bar, Joshua could see Steve Garner and Harold Lyons holding guns. Shots erupted. Joshua could not see who had fired.
Dr. William Newman, an expert anatomic pathologist, performed the autopsy. He said the victim suffered a gunshot wound to the left hand, and to the right thigh, two gunshot wounds to the chest and a gunshot wound to the ear. Either one of the wounds to the chest or the wound to the head was fatal. The bullet recovered from the chest was a smaller caliber than the bullet removed from the skull.
Sergeant Bruce Harrison obtained a search warrant for the Garner residence. They discovered two weapons in a garbage bag in the backyard of the residence. He said he took Joshua's statement and that she believed the Garner brothers had shot the victim.
Lynn Smith testified that when Clayton tried to touch her, Steve Garner told him to leave her alone. Clayton went outside and summoned Gilmore, a man named Dion, and a man named June. All of them came back in the bar and stood around Steve Garner. The men went outside the bar. Smith followed and saw Glenn Garner fist fighting with the victim. The Garner brothers and Harold Lyons then left. Later, she saw the three pass the bar in a car. Still later, she, Steve Garner, and Harold Lyons were standing outside the bar. She saw Gilmore come out of the bar and attempt to run. She saw Harold Lyons shoot Gilmore. On cross, she said Gilmore and Clayton were members of a gang called the "Tuesday Crew" known for carrying guns and committing acts of violence. She said she did not know if they had guns on the night of the crime.
Detective Dwight Deal testified he and Detective Melvin Winnins drove Smith to the Garner residence so they could get an accurate description. As they approached the house, Smith pointed out the Garner brothers who were standing outside. The men ran into the house upon seeing the police car. The officers called for a back-up. They knocked on the door and the Garners' father answered. The officers then arrested the two men. Elmo Garner, another brother, was also taken to the homicide office, but he was not arrested because the officers learned he was not present at the shooting. Elmo Garner told the officers the guns were at the house. Harold Lyons was also present at the house, but the officers did not arrest him because they did not know at the time he had been involved in the crime.
John Treadway, a firearms expert with NOPD, testified he examined four bullets. Three of the bullets were discovered in the autopsy and one was discovered at the scene. Treadway stated two of the bullets from the autopsy were fired from one gun recovered from the Garner residence. The third bullet from the autopsy and a bullet from the scene were fired from the second gun recovered.
Barbaroso Welch, legal assistant to the firm representing the Garner brothers, testified Smith told him that Clayton and Dion removed the jewelry and pocket contents from the victim and that Dion picked up a revolver and threw it into a vacant lot.
The defense then called Lynn Smith who testified she saw the victim with a gun after the fist fight.
Steven Garner testified Clayton approached Smith while they were in the bar. Garner told him to leave. He left and returned with friends including Dion and the victim. The men went outside. Clayton hit Glenn Garner in the face with a weapon. Then Glenn and Steven Garner and Lyons left in a car. Steven Garner admitted they were armed. After going to another bar, the men were returning home when they passed the first bar. Steven Garner saw Smith, and they stopped to talk to her. Glenn went inside to get a beer. When he came back out, Gilmore followed him. Steven realized Gilmore had a gun and he called out to Glenn. Gilmore fired. Steven fired, and Glenn fired. On cross examination, Steven Garner denied circling the block. He said Lyons did not have a *1206 gun. He also said he did not know how many bullets he or his brother fired. He admitted putting the guns in the trash behind his house. He said he was never advised of his rights and was told he would be set free if he told the truth. He denied telling Winnins that he had taken the victim's gun away from him and shot him with it. The State introduced a rights of arrestee form signed by Steven Garner.

ASSIGNMENT ONE:
The defendant argues that trial court erred in denying his motion to suppress the guns. The defense argues that Elmo Garner was under arrest when he told the officers where the guns were located, that he had not been informed of his Miranda rights, and that, as a result, his statement should have been suppressed.
At the motion hearing, Elmo Garner testified that when the officers arrived at his house in the early morning hours of November 6, 1990, they handcuffed him and took him to the homicide office. He said he was not placed under arrest, but was threatened that if he did not tell where the guns were located, he would be incarcerated.
Officer Bruce Harrison testified Elmo Garner was originally a suspect and was under investigation at the time he was brought to the homicide office. He said Elmo Garner was never under arrest and that accordingly he was not advised of his Miranda rights. He said he was not threatened and that no promises were made. He said when he made the statement, he was no longer under investigation and was free to leave.
In explication of the basic rights to the assistance of counsel and the freedom from self-incrimination, the Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), held that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. By "custodial interrogation," the Miranda court meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. See Beckwith v. United States, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969); Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). Thus, it is clear that the constitutional warnings are required in "situations falling short of a formal placing in arrest ... in which the accused may be said to be under custody or significant restraint." State v. Roach, 322 So.2d 222, 227 (La.1975).
No less is required by Article I, § 13 of the 1974 Louisiana Constitution. By providing that a person "arrested or detained in connection with the investigation" of an offense must be fully advised of his rights, the framers intended to require that investigating officers give the warnings anytime such a citizen was deprived of his liberty in a significant way or was not free to go as he pleased. State in Interest of Dino, 359 So.2d 586 (La.1978), cert. den. Louisiana v. Dino, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978); State v. Segers, 355 So.2d 238 (La.1978); State v. Welch, 337 So.2d 1114 (La.1976).
Whether a person has been taken into custody, detained or deprived of his freedom of action in a significant way must be decided by an objective test. Any formulation making the need for Miranda warnings depend upon how each individual being questioned perceived his situation would require a prescience neither the police nor any one else possesses. On the other hand, a standard hinging on the inner intentions of the police would fail to recognize Miranda's concern with the coercive effect of the "atmosphere" from the point of view of the person being questioned. United States v. Hall, 421 F.2d 540 (2d Cir.1969); State v. Roach, 322 So.2d 222 (La.1975); State v. Corey, 339 So.2d 804 (La.1976). *1207 State v. Menne, 380 So.2d 14, 17 (La. 1980), cert. den. Louisiana v. Menne, 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980).
In Menne, the defendant was questioned by the police and denied any complicity in a murder. Later, he became an object of sharpened interest to the investigating officers when they learned that at one time he had owned the murder weapon. An officer telephoned him and asked him to come to the police station for questioning. He agreed and was taken to the station house by a police squad car. He was taken to an interrogation room. He was not advised of his constitutional rights, and he was never informed that he was not under arrest or that he was not obliged to remain or to submit to questioning. The defendant confessed to the killing. The Louisiana Supreme Court found, viewing the evidence objectively, from the standpoint of a reasonable interrogee, that the defendant was deprived of his freedom of action in a significant way. The court reached this result even though the defendant had not been physically restrained or told he was under arrest. The Court distinguished Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) where the Supreme Court found that a person questioned by a police officer had not been taken into custody or otherwise deprived of his freedom in any significant way. The officer had left his card at the defendant's house, and the defendant called back. The officer asked him if he would meet at a state patrol office two blocks from his apartment. Importantly, the defendant was told he was not under arrest.
In State v. Raheem, 464 So.2d 293 (La. 1985), the Louisiana Supreme Court determined the defendants were under arrest when they were ordered out of their car at gunpoint and told to place their hands on the car. In State v. Junegain, 478 So.2d 542 (La.App. 4th Cir.1985), writ den. 483 So.2d 1018 (La.1986) this court held the defendant was under arrest at the time the officer took him to a department store security office and explained that he fit a description. This result was not altered by the officer's failure to advise the defendant verbally that he was under arrest at the time he was patted down. In State v. Jordan, 506 So.2d 230 (La.App. 4th Cir. 1987), this court found the defendant was under arrest when he was handcuffed and placed in the police car. By contrast, in State v. Moran, 451 So.2d 48 (La.App. 4th Cir.1984), writ den. 456 So.2d 165 (La. 1984), this court found that the defendant had not in any sense been detained or deprived of his freedom when he made the statements in question. When the officers first spoke to the defendant in his apartment, they had only a verbal statement from another suspect incriminating the defendant. The defendant was a fellow policeman and the officers were interested in clearing him. After the first encounter with the defendant, the officers left one officer behind, not to restrict or detain him, but to comfort him. Later, the officers returned and confronted the defendant with evidence he may have changed clothes, but there still was no evidence the officers had reasonable cause to arrest him. This court found the defendant was not under arrest.
In this case, Elmo Garner was handcuffed, placed in a patrol car, and taken to the homicide office for investigation. By the officers' own admission, he was under investigation for the crimes. Although the officers later determined, allegedly before the statement was taken, that he was no longer under investigation, there is no evidence that this fact was conveyed to him. There is no evidence the officers ever told him he was not under arrest or that he was free to go. Although Elmo Garner testified he was not formally placed under arrest, it does not appear, viewing the evidence objectively, from the standpoint of a reasonable interrogee, that Elmo Garner believed he was free to leave the homicide office. Accordingly, since he was not advised of his Miranda rights, the confession appears to have been illegally obtained and the statements should have been suppressed. State v. Evans, 581 So.2d 372 (La.App. 4th Cir.1991), writ den. 588 So.2d 112 (La.1991).
*1208 In addition, the guns, which were seized after a warrant was obtained based on the statement, should have been suppressed as fruits of the poisonous tree under Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The defendant has standing to raise this issue. Art. I, § 5 of the La. Const. of 1974 provides as follows:
Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.

(emphasis added).
This provision expands the scope of protection afforded Louisiana citizens by granting standing to contest the illegality of a search or seizure to "any person adversely affected." Under Louisiana jurisprudence, any defendant against whom evidence is acquired as a result of an allegedly unreasonable search and seizure, whether or not it was obtained in violation of his rights, has standing to challenge the constitutionality of the search or seizure. State v. Gibson, 391 So.2d 421 (La.1980); State v. Walker, 430 So.2d 1327 (La.App. 3rd Cir. 1983). State v. Williams, 489 So.2d 286 (La.App. 4th Cir.1986); State v. Dakin, 495 So.2d 344 (La.App. 4th Cir.1986), writ den. 498 So.2d 752 (La.1986). Here, the defendants are adversely affected by the illegally obtained statement and resultant seizure; as such they have standing to raise the constitutional issues.
There are three exceptions to Wong Sun's exclusionary rule. State v. Butler, 609 So.2d 901 (La.App. 4th Cir.1992). As noted in United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), the exceptions are the independent source doctrine, the inevitable discovery doctrine, and the attenuation doctrine. The independent source doctrine is not applicable here because in his original statement to the police Steven Garner testified that the defendant did not take the guns with them when they left the crime scene. Thus, the only source of information that led the officers to the discovery of the guns was the statement of Elmo Garner. Nor is the attenuation doctrine applicable.
The inevitable discovery doctrine, however may be applicable. In Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the U.S. Supreme Court held that unconstitutionally obtained evidence may be admitted at trial if it would inevitably have been seized by police in a constitutional manner. The court's decision was based on its belief that it is unfair to penalize the government through application of the exclusionary rule where the police would have obtained the evidence even if no misconduct occurred. In Nix, the police organized a search for the body of a young girl they feared had been murdered. While the search party combed a designated area of several square miles, a police officer coerced the defendant into revealing where he had hidden the body. Notwithstanding the fact that the defendant's assistance was unlawfully obtained, the Supreme Court held that the prosecution properly introduced evidence at the defendant's murder trial concerning the body's discovery and condition, on the grounds that the search party would have found the body even without the defendant's help.
This court has applied the inevitable discovery exception on several occasions. In State v. Clark, 499 So.2d 332 (La.App. 4th Cir.1986), this court found that because the robbery victim specifically identified the defendants and the getaway van, probable cause existed to obtain a warrant to search the vehicle. Since the knife found in the vehicle would have been discovered inevitably in a search pursuant to a warrant without any police misconduct, the weapon was admissible even though it was not initially legally seized. In State v. Hill, 458 So.2d 521 (La.App. 4th Cir.1984), the police questioned *1209 the suspect without advising him of his rights. He told them where his car was parked. The police identified the car as the one in which he had seen the perpetrator leave the crime scene. After this, the police advised the suspect he was under arrest and seized the car. The court found the defendant's statement was obtained in violation of Miranda; however, it held the seizure of the automobile was not the tainted fruit of the poisonous tree since the case fairly supported the finding that the automobile would have been discovered and linked to the defendant even without the aid of the illegally obtained statement. The police had an accurate and detailed description of the car which they had broadcast over the police radio; the car was not hidden, but parked in open view in a parking lot behind a restaurant, which although closed, was located on a busy highway; and the car was only a short distance from where the defendant was arrested.
In applying the inevitable discovery exception, we rely on the following facts. The officers testified they went to the residence to verify the address and to obtain a description of the property. Therefore, it is assumable that they intended to obtain a search warrant for the residence, not merely an arrest warrant for the defendants. The defendants were found outside their house only a matter of hours after the crime was committed. Since they did not have a long time to plan disposal of the guns, the guns were likely to be found in the residence. Thus, the officers would have obtained a search warrant for the house without the statement of Elmo Garner and would have found the guns in the backyard since the gun protruded from the bag in which they were contained and were in the officers' plain view.

ASSIGNMENT TWO:
The defendants argue the initials on Elmo Garner's statement were not his and that therefore the search warrant was not valid. At the motion hearing, Elmo Garner testified that the initials on the first two pages of the statement were not his. However, he admitted signing the statement and that he did in fact make the statement. Thus, there is no evidence to the contrary that the statement was not that of Elmo Garner and this assignment is without merit.

ASSIGNMENT THREE:
The defendants argue they should have been allowed to recall an unnamed witness at the motion hearing. They argue the rule of sequestration had not been invoked, and, therefore, they should have been allowed to recall a witness who, after testifying, had remained in the courtroom.
The defendants do not identify the witness. They make no proffer of what the testimony would have been. They do not show how they were prejudiced. Accordingly, this assignment is without merit.

ASSIGNMENT FOUR:
The defendants claim the trial court erred by not requiring the State to furnish them with a copy of the victim's prior conviction record or requiring the State to ascertain if the victim had a prior conviction record. Question # 6 of defendants' Bill of Particulars asked, "Was the alleged victim ever convicted of a crime or offenses?" Question # 7 asks "If the answer to number six (6) is affirmative, please list all convictions." The State's reply to # 6 was "Not known by State at this time." The State's reply to # 7 was "Not applicable." The court ruled at the hearing on discovery that the State's answers were good and sufficient.
The defendants apparently argue that they were denied Brady material in that if the victim had a record and thus a history of violence, this evidence would have supported their claim of self-defense. However, the defendants put forth no evidence that the victim had a record or that the State was in possession of the evidence and refused to reveal it. Thus the defendants failed to support their argument and this assignment is without merit.

ASSIGNMENT FIVE:
The defendants argue the trial court erred in its instructions to the jury *1210 regarding self-defense. The defendants make absolutely no argument to support this contention and have abandoned this assignment as it was not briefed. Rule 2-12.4, Uniform Rules, Courts of Appeal.

ASSIGNMENT SIX:
The defendants argue the State failed to present sufficient evidence to support the conviction. The standard for deciding whether a jury's decision is reasonable is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Ballom, 553 So.2d 909 (La.App. 4th Cir.1989); writ denied 559 So.2d 137 (La.1990).
La.R.S. 14:30.1 defines second degree murder, in pertinent part:
Second degree murder is the killing of a human being.... (1) (w)hen the offender has a specific intent to kill or to inflict great bodily harm.
Defendant Steven Garner admitted that he and his brother Glenn fired at the victim. The victim died of two fatal wounds. One of each of the bullets was fired from one of each of the guns found in the defendants' backyard. Although Steven Garner testified they fired in self-defense, other witnesses testified the victim did not have a gun. No gun was found on his body or in the vicinity. The credibility of the witnesses is an issue for the trier of fact. State v. Cashen, 544 So.2d 1268 (La. App. 4th Cir.1989). Thus this assignment is without merit.
For the reasons discussed, the convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] The State eventually amended the indictment to charge Lyons with manslaughter and Lyons, after this trial ended in mistrial as to him, charged his plea to guilty as charged.