530 So.2d 1146 (1988)
SUCCESSION OF Noah CLOUD.
No. 87-C-1619.
Supreme Court of Louisiana.
September 12, 1988.
Rehearing Denied October 20, 1988.
*1147 Steven Crews, Watson, Murchison, Crews, Arthur & Corkern, Natchitoches, for applicant.
John Blake, Dist. Atty., Martin Sanders, Jr., Sanders & Sanders, Winnfield, for respondent.
LEMMON, Justice.
This litigation began as an action by four of the five children of Noah Cloud to set aside as a simulation the purported cash sale of immovable property from Cloud to B.M. Hatch, the then husband of Cloud's fifth child, Urzula C. Hatch. The suit also sought to set aside a subsequent transfer of the property from Hatch to his ex-wife as part of the community property settlement, as well as two transfers of mineral interests from Mrs. Hatch to Martin Sanders, her attorney, and a later transfer of the property from Mrs. Hatch to Urzula, Inc. The sale from Cloud to Hatch was ultimately set aside as a simulation by a portion of a judgment which is now definitive on that issue. We granted certiorari to review the portion of the judgment which upheld Sanders' mineral interest in the property.
On August 21, 1964, Noah Cloud, then eighty-four years old, executed a deed which purported to transfer a twenty-acre tract of land for $250 to his son-in-law, B.M. Hatch. Shortly thereafter Cloud and his wife moved into the residence of their daughter, Mrs. Hatch. At the time the twenty-acre tract was subject to a mineral lease in favor of Placid Oil Company. When production was obtained in 1965, Placid paid royalties under the lease to Cloud.
Cloud died in 1966, and his wife was interdicted shortly thereafter. Mrs. Hatch was appointed administratrix of Cloud's succession. At the direction of the succession attorney Placid began paying the monthly royalties to the administratrix.
During the administration of the succession Mrs. Hatch filed two descriptive lists, each listing the past and future royalty payments from Placid (but not the twentyacre tract) as succession property. She also filed twenty-eight tableaus of distribution between the opening of the succession and her mother's death on March 11, 1980. In each tableau she listed her mother as the owner of one-half of the succession funds from Placid's royalty payments and the usufructuary of the other one-half.[1]
In the meantime Mrs. Hatch and her husband were divorced in 1974. The husband was represented in the divorce proceeding by attorney Martin Sanders. In 1976 Mr. and Mrs. Hatch entered into a community property settlement (handled by Sanders) which awarded the twenty-acre tract to Mrs. Hatch.[2]
After Mrs. Hatch's mother's death in March, 1980, the attorney for the succession prepared a document dividing the ownership of the twenty-acre tract and the accumulated royalties equally among the five children. Mrs. Hatch refused to sign, believing that she deserved a larger share because she had taken care of her mother for almost seventeen years after her father's death.
Two or three months after her mother's death, Mrs. Hatch consulted attorney Sanders about her dispute with her siblings over the property and the accumulated royalty *1148 funds. Sanders advised her that she was the record owner of the property and as such was entitled to all of the mineral revenues. She employed Sanders to represent her in the dispute and executed a deed, dated June 20, 1980, which transferred a one-fourth mineral interest in the twenty-acre tract to Sanders for the consideration of $10,000 "in legal services". At trial Sanders admitted (as he had in his deposition) that the consideration for the transfer was legal services "to be rendered" because Mrs. Hatch did not have any money to pay for the services which he had been hired to perform.[3]
In April, 1981, Sanders furnished Placid with certified copies of the 1964 sale from Cloud to Hatch, the community property settlement, and the mineral transfer from Mrs. Hatch to him. In accordance with Sanders' request Placid began paying the monthly royalties to Mrs. Hatch and Sanders.[4]
On May 19, 1981, Mrs. Hatch's siblings filed a rule to remove her as administratrix of the succession and to require an accounting. On behalf of Mrs. Hatch, Sanders filed an answer and an exception, claiming ownership of the property and the accumulated royalties on the basis of the 1964 sale from Cloud to Hatch and the subsequent community property settlement. After a hearing the trial judge on July 17, 1981 ordered Mrs. Hatch to file an accounting before September 7.
On August 31, 1981, Mrs. Hatch transferred an additional one-twelfth mineral interest in the twenty-acre tract to Sanders for the consideration of $10,000 "in legal services", which Sanders explained at trial was legal services already performed and to be performed. The next month he filed the accounting ordered by the court.
On November 20, 1981, Mrs. Hatch's siblings filed another rule to traverse the accounting and to remove her as administratrix.
Except for the transfer of the twentyacre tract by Mrs. Hatch to Urzula, Inc., a corporation formed for her by Sanders, the record does not show any other activity relative to the property until December 8, 1983, when Cloud's five children filed a joint motion to withdraw the accumulated royalty payments which were being held in the succession account.[5] In the settlement agreement the five children agreed to divide the funds equally in order to close the succession, without prejudice to any party as to any other claim relating to the successions of Cloud and his wife.
On May 7, 1984, Mrs. Hatch's siblings filed the present action attacking the 1964 sale from Cloud to Hatch as a simulation and seeking to set aside the subsequent transfers. Mr. and Mrs. Hatch, Sanders, Urzula, Inc. and Placid were made defendants.
After a trial on the merits the trial judge dismissed the action. Reasoning that the plaintiffs had the burden of proving a simulation because Hatch was not an heir and because Cloud did not remain in possession, reserve a usufruct or retain possession by precarious title, the judge ruled that plaintiffs did not meet this burden.
The court of appeal reversed. 508 So.2d 577 (1987). On original hearing the intermediate court set aside the 1964 sale from Cloud to Hatch as a simulation and held that the twenty-acre tract belonged to the succession of Noah Cloud.[6] Because the *1149 court had not discussed or expressly ruled on the question of how the declaration of simulation affected Sanders' recorded mineral interest in the property, a rehearing was granted.[7]
On rehearing the court amended its prior decision and ruled that Sanders' mineral interest was not affected by the declaration of simulation. The court reasoned that the mineral deeds were not simulations because some consideration in the form of legal services had been given. The court further concluded that Sanders did not violate either La.C.C. art. 2447, which prohibits the purchase of a litigious right by an attorney, or DR 5-103(A) of the Code of Professional Responsibility, which generally prohibits an attorney from acquiring a proprietary interest in his client's cause of action, because no suit was pending at the time of the transfer.[8] The court noted also that Sanders was a third party relying on Mrs. Hatch's ownership status reflected by the public records. We granted certiorari to review these rulings. 513 So.2d 280 (La.1987).
Several members of this court were inclined to reconsider Gautreaux v. Harang, 190 La. 1060, 183 So. 349 (1938), which held that La.C.C. art. 2447 did not prohibit an attorney from purchasing an interest in his client's genuinely disputed claim to immovable property when no suit was pending at the time of the purchase. Because Article 2447 also applies to other public officers and because we conclude that Sanders' purchase of mineral rights in the present case was invalid for other reasons, it is unnecessary to address the Article 2447 issue.[9]
At the time of the mineral transfer to Sanders an attorney was prohibited by the Code of Professional Responsibility from acquiring a proprietary interest in the cause of action being handled for the client except by means of a reasonable contingency fee contract or by a lien granted to secure his fee and expenses.[10] The purpose of DR 5-103(A) is to prevent a lawyer from speculating on the outcome of a lawsuit by purchasing a percentage of his client's hoped-for recovery at a discounted figure. See generally G. Hazard & W. Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional *1150 Conduct, Rule 1.8(e) and (j) (1985). The rule was designed not only to prevent lawyers from stirring up litigation, but also to minimize the possible adverse effect of the purchase upon the lawyer's exercise of judgment on behalf of his client during litigation. If a lawyer were allowed generally to purchase a proprietary interest in his client's cause, he would first have to negotiate with the client on the amount to which the value of the claim should be discounted. Later, his judgment might be impaired by his conflicting interest in protecting his paid-for investment when an inadequate settlement is offered in a meritorious but close case.
The exceptions listed in DR 5-103(A) do not solve these conflict of interest problems, but represent a compromise designed to balance countervailing factors. Allowing acquisition of a lien by the lawyer to secure his fee and expenses produces a danger of a conflicting interest by the lawyer to protect his investment, but eliminates a possible source of friction in the lawyer-client relationship. Contingency fee contracts, although not without problems, have the desirable effect of encouraging lawyers to represent clients with meritorious claims that the clients could not otherwise afford to litigate. Of course, the lawyer must enter into such an arrangement in good faith and only when it is beneficial to the client.
In the present case the attorney, shortly after he was employed to represent the client in defending her disputed claim against her siblings, acquired a proprietary interest in that claim in clear violation of DR 5-103(A). The difficult question is whether the client and her co-owners can assert this violation of DR 5-103(A) as a basis for nullifying the transfers and recovering the mineral interests from the attorney. We hold that the plaintiffs can do so, at least as long as the acquired interest is still in the name or control of the attorney.
The standards in the Code of Professional Responsibility which govern the conduct of attorneys have the force and effect of substantive law. Louisiana State Bar Association v. Connolly, 201 La. 342, 9 So.2d 582 (1942); Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102 (La.1979); Leenerts Farms, Inc. v. Rogers, 421 So.2d 216 (La.1982); Moody v. Arabie, 498 So.2d 1081 (La.1986); City of Baton Rouge v. Stauffer Chemical Co., 500 So.2d 397 (La.1987). The disciplinary rules are mandatory rules that provide the minimum level of conduct to which an attorney must conform without being subject to disciplinary action. When an attorney enters into a contract with his client in direct and flagrant violation of a disciplinary rule and a subsequent civil action raises the issue of enforcement (or annulment) of the contract, this court, in order to preserve the integrity of its inherent judicial power, should prohibit the enforcement of the contract which directly contravenes the Code adopted by this court to regulate the practice of law. Saucier v. Hayes Dairy Products, Inc., supra, (Dennis, J., dissenting on original hearing). Otherwise, this court's authority to regulate attorney conduct will be substantially undermined.
Furthermore, the prohibition in the disciplinary rule does not apply only when there is a pending lawsuit. When the client consults the lawyer about a right which is genuinely disputed and likely to become the subject of litigation, and the attorney agrees to pursue the claim, the prohibition applies. Otherwise, there would be too much potential for abuse by the attorney who has substantial control over the filing or the answering of a suit.
In the present case the attorney's contracts of acquisition of a proprietary interest in his client's genuinely disputed claim to the property was a direct violation of DR 5-103(A).[11] The attorney here seeks to *1151 maintain his mineral interest by enforcing the contracts which contravene DR 5-103(A). This court cannot place its stamp of approval on such contracts and must declare them null. In doing so, we note that the attorney could have acquired an interest in the client's property claim by entering into a contingency fee contract for a percentage of the client's recovery in excess of her uncontested one-fifth interest as an heir.[12] Also, the attorney could have taken a lien to secure his fixed fee of $20,000. His totally impermissible conduct in contracting to acquire an interest in the client's genuinely disputed claim in violation of DR 5-103(A) has now yielded him funds in excess of $108,000, and the contract simply cannot be allowed to stand.
Accordingly, the judgment of the court of appeal is reversed. The case is remanded to the district court to issue a judgment annulling the transfers of the mineral interests from Urzula Cloud Hatch to Martin S. Sanders, Jr.
COLE, J., concurs in the result.
NOTES
[1] Each judgment of homologation authorized payment of accumulated funds to the curatrix of Mrs. Cloud.
[2] In 1971 Hatch had executed a cash sale of the twenty-acre tract to his wife which recited a $2,000 consideration. Hatch testified he was aware at the time of the transfer that such a sale from a husband to his wife during the marriage was invalid. He explained he signed the deed in an effort to get along while he and his wife were having marriage problems.
[3] In his deposition Sanders stated that he based the fee on his estimation of the present value of the total mineral interest (which was then yielding about $30,000 per year), adding that "it was just a question of getting paid for the work that [he was] fixing to do".
[4] At the time of Sanders' request Placid had paid $221,992.96 in royalties to the administratrix of the succession. Thereafter, Placid paid $249,809.95 to Mrs. Hatch and $108,945.51 to Sanders until payments were stopped in February, 1985 because of pending litigation.
[5] The principal amount of these funds was $43,456.51.
[6] The court reasoned that the exercise of dominion by Cloud and his succession over the mineral royalties from the property raised a presumption that the sale was simulated, especially when considered with Mrs. Hatch's admissions in the descriptive lists and the petitions relating to the tableaus of distribution and with her testimony in an alimony rule in her divorce proceeding that she did not own any property in Natchitoches Parish and that neither she nor her husband had paid for the purchase of the oil producing property. The court concluded that Hatch's testimony that he paid $2,000 for the tract, weakened by the absence of supporting documentation and by his wife's admission that she did not know of any consideration paid for the property by her husband, was insufficient to overcome the inference of simulation.
[7] When the case was pending on rehearing, Mrs. Hatch compromised the ownership issue with her siblings and withdrew (through new counsel) her rehearing application, reserving any rights with respect to the issue of Sanders' mineral interest. Mrs. Hatch later aligned herself with her siblings in applying to this court for certiorari.
[8] The Code of Professional Responsibility has been replaced by the Rules of Professional Conduct, effective January 1, 1987. However, the conduct in question occurred before the effective date.
[9] The Gautreaux decision has been criticized in scholarly commentary. Comment, The Transfer of Litigious Rights in Louisiana Civil Law, 1 La.L.Rev. 593 (1939); Comment, The Sale of Litigious Rights, 13 Tul.L.Rev. 448 (1939).

The purchase of a litigious right gives rise to two possible remedies. The person against whom the right has been transferred may redeem the right by paying the price of the transfer. La.C.C. art. 2652. But since the purchase of a litigious right by certain public officers is absolutely prohibited, such a purchase may be annulled. La.C.C. art. 2447.
Immediately following Article 2652 is the definition of a litigious right as one where "there exists a suit and a contestation on the same". La.C.C. art. 2653. However, La.C.C. art. 3556(18), which was adopted at the same time that Article 2447 was first included in the Code, contains a definition which arguably could be interpreted as not requiring pending litigation. It has been suggested that the definition in Article 3556(18) was intended to apply only to the purchase prohibited by Article 2447, while the definition in Article 2653 applies only to a purchase redeemable under Article 2652. Comment, supra, 1 La.L.Rev. at 596.
[10] Disciplinary Rule 5-103(A) (then in effect) provided:

"(A) A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he is conducting for a client, except that he may:
"(1) Acquire a lien granted by law to secure his fee or expenses.
"(2) Contract with a client for a reasonable contingent fee in a civil case.
[11] Whether or not the client's claim is genuinely in dispute is a question of fact in each case. Here, there was clearly a genuine dispute over the ownership of the property. Mrs. Hatch consulted the attorney to represent her after her siblings indicated they would not recognize her claim. At the trial after this action was filed by the siblings, Hatch testified that he paid $2,000 for the property, but allowed the royalties to go first to Cloud and then to the succession because the money was used to take care of them without his having to pay taxes on the income. Cloud's other children testified that he had become senile and that they arranged to have the title placed in Hatch's name in order to prevent their father from signing away his interest to royalty buyers who descended on the area in the wake of the discovery of the Black Lake Field. In her divorce proceeding under cross-examination by Sanders, Mrs. Hatch testified that neither she nor her husband had paid for the oil producing property.
[12] Because the client did not recover any additional amount, the fee would have been zero.