**FOLEY & LARDNER, L.L.P.**

v.

**ALDAR INVESTMENTS, INC., et al.**

Foley & Lardner, L.L.P.

v.

Kenneth G. Daniels, L.L.C., et al.

Civil Action Nos. 03–760–JJB, 04–866–JJB.

United States District Court, M.D. Louisiana.

May 30, 2007.

Fredrick R. Tulley, Michael Allen Crawford, Taylor, Porter, Brooks & Phillips, Baton Rouge, LA, for Foley & Lardner, L.L.P.

J. Marvin Montgomery, Louis Middleton Phillips, Brandon A. Brown, Gordon, Ara-

ta, McCollam, Duplantis & Egan, Baton Rouge, LA, for Aldar Investments, Inc., et al.

James Huey Gibson, David J. Ayo, Allen & Gooch, Lafayette, LA, for Kenneth G. Daniels, L.L.C.

## MEMORANDUM OPINION
## AND ORDER

BRADY, District Judge.

These consolidated suits arise out of a dispute over attorney's fees between AL-DAR Investments, Inc. ("Aldar") and Foley & Lardner ("Foley"), a law firm that provided legal representation to Aldar in an antitrust suit.

In action 03–760, Foley claims that defendants Darlene Ransome ("Ransome") and the Ransome Law Firm, L.L.C. ("RLF"), along with Aldar, defrauded Foley and deprived Foley of a collateral mortgage that Aldar promised to give to Foley as security for payment of attorney's fees. In action 04–866, Foley claims that Kenneth G. Daniels and his law firm (together as "Daniels") committed legal malpractice by failing to properly prepare and execute the collateral mortgage. Daniels has filed a third party demand against Aldar and Ransome seeking a judgment nullifying the cancellation of the collateral mortgage.

The matters were heard by the court at a bench trial held August 14–17 2006 and October 23–25, 2006. The only claims tried were Foley's claim against Ransome and RLF for fraud, and Foley's claim against Daniels for legal malpractice. The court, having considered all testimony, evidence, and arguments, now enters these findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

In 1996, Livingston Downs Racing Association filed suit against Jefferson Downs Corporation in the Middle District of Louisiana. It was an antitrust suit that arose from events that occurred during Livingston Downs' attempt to develop a horse racing facility on its land in Livingston Parish. Aldar is the successor entity, via a name change, of Livingston Downs. Aldar never developed a source of revenue and it never owned any substantial assets other than land in Livingston Parish. Ransome is the sole owner and president of Aldar. Throughout the remainder of this opinion, Livingston Downs and Aldar will be referred to simply as "Aldar" for ease of discussion.

Aldar was initially represented in its antitrust suit by the Baton Rouge law firm Breazeale, Sacshe, and Wilson. Breazeale acted as lead counsel, while Ransome, a licensed attorney herself, and RLF acted as co-counsel. In December 2000, Ransome began to seek new counsel in response to Jefferson Downs' retainment of the Washington D.C., legal firm of Hogan & Hartson. To match the perceived strength of Hogan & Hartson, Ransome retained the legal services of another Washington D.C., law firm, namely Hopkins & Sutter. Ransome at that point mainly interacted with David Ralston ("Ralston"), a partner at Hopkins & Sutter.

Ransome chose Hopkins & Sutter because of its strong reputation for handling antitrust litigation. During initial discussions with Aldar, Ralston learned that Aldar was having difficulties paying its attorney's fees to Breazeale. As a result, Ralston and Ransome agreed that the amount of work Hopkins & Sutter would perform for Aldar would not exceed $15,000. The agreement was formalized in an engagement letter dated December

6, 2000. In it, Ralston and Steve Lambert (another partner at Hopkins & Sutter) were to be the principal attorneys handling the antitrust case. Aldar was to pay $15,000 as a retainer from which Hopkins & Sutter would draw money to pay its monthly bills. If Aldar failed to keep the retainer current, the law firm was permitted to withdraw from representation.

In February 2001, Hopkins & Sutter merged with Foley. Ralston and Lambert became partners at Foley and continued their representation of Aldar. It is noted that at that time Foley was the 11th largest law firm in the country. Its Washington D.C., office had over 130 attorneys and its attorneys could provide decades of experience, especially in antitrust litigation. The merger between Hopkins and Foley did not cause any change in the terms of the initial engagement letter with Aldar.

It soon became evident that the cost of litigation was going to far exceed the original $15,000. However, Foley did not choose to withdraw. Instead, Foley envisioned a pot at the end of the rainbow. At one point in 2001, before a mediation session, Foley estimated a judgment in favor of Aldar, and against Jefferson Downs, in the amount of $80 million. When discounted for mediation, the estimated value was still as high as $20 million. Thus Foley continued to represent Aldar even though it was well aware that Aldar was experiencing difficulties paying its fees.

Aldar's initial retainer only lasted through September 2001. From October 1, 2001 through May 31, 2002, Foley's unpaid bills ballooned from zero to almost $430,000. Every month Ransome would receive a bill, and every month she contacted Ralston to inform him that Aldar could not afford to pay the bill. She continually pressed Ralston to agree to amend the fee agreement to a contingency fee agreement. And each month Ralston re-

jected that offer, stating that it was not an opportune time to present such matters to Foley's managing committee. However, up until June 2002, Foley never pressed Aldar for payment of fees. The court finds that Foley's decision to continue working on behalf of Aldar was directly caused by its expected value of the antitrust suit. However, the court also finds that at no time did Aldar or Ransome suggest to Ralston that Foley withdraw and discontinue services.

The antitrust litigation started to become somewhat turbulent for Foley by June 2002, with the onslaught of a flurry of motions filed by Jefferson Downs. Jefferson Downs filed a motion to dismiss and a motion to exclude expert testimony, *inter alia*, and only then did Foley realize that its expected value of the antitrust case was not as high as originally perceived to be. As a result of the possibility of dismissal of Aldar's claims, Ralston sent a letter to Aldar on July 5, 2002. The letter outlined three alternatives for payment of Foley's outstanding legal fees. Each alternative required Ransome, and her husband, to issue personal guarantees to Foley. On August 8, 2002, Aldar responded with a proposal that it would give Foley a second mortgage on Aldar's property in Livingston Parish as collateral for Foley's past and future legal fees. The second mortgage was to be in the form of a collateral mortgage. Extensive negotiations between the two continued. The court finds that both parties had equal bargaining power with respect to devising an alternative structure for the payment of legal fees. At all times, Ransome and RLF were fully informed, as was Foley, and at all times negotiations were conducted in a fair and reasonable manner. Foley accepted Ransome's offer of using a collateral mortgage to secure Aldar's indebtedness.

Foley was acting with a strong sense of urgency in wanting to finalize the mortgage. On October 1, 2002, Aldar and Foley executed a "Revised Fee Agreement." The revised fee agreement set Foley's fee due as of October 1, 2002 at $517,861.73. The revised fee agreement also provided for an additional contingency fee ranging from 3.5 percent to 10 percent based on the time any settlement or judgment occurred. The court finds that Ransome fully represented Aldar's interests as independent counsel during the fee negotiations with Foley. While Ransome argues that Foley had a conflict of interest because it did not inform Aldar of the need to retain independent counsel, the court finds that Ransome and RLF actually acted as independent counsel for Aldar. No conflict of interest was present during the fee negotiations as all sides were represented by independent counsel.

The revised fee agreement also called for a series of future transactions between Aldar and Foley, including a collateral mortgage transaction. Ransome consulted with a CPA, independent of Foley, about the mortgage transaction and the proposed interest rate on the promissory note. As the transaction took place in Louisiana, the collateral mortgage consisted of a promissory note (also known as a hand note) evidencing the debt. The hand note was to be secured by a collateral mortgage note for a greater amount, which in turn was secured by a collateral mortgage on the property. The collateral mortgage was for a greater amount in contemplation of future indebtedness between the mortgagor and the mortgagee. The collateral mortgage transaction, taking place in Louisiana, was not complete, however, until the promissory note and collateral mortgage note were pledged to the mortgagee, Foley, by actual delivery of the notes.

The court finds that all parties intended for the October 1, 2002 revised fee agreement to be a final fee agreement between Aldar and Foley. Ransome testified to the contrary, stating that the revised fee agreement was nothing more than an interim agreement. The court does not believe Ransome's testimony, and instead finds Ralston's testimony that this was a final fee agreement to be the truthful testimony. Therefore the court finds that the collateral mortgage transaction was not dependent upon the execution of another fee agreement, and no other fee agreement was contemplated between the parties subsequent to the execution of the October 1, 2002 revised fee agreement.

At the suggestion of Ransome, first made on September 11, 2002, Foley retained the legal services of Daniels in early October 2002 to serve as Foley's counsel. Ransome explained to Foley that Daniels was familiar with Aldar's property in Livingston Parish, and that he had previously done title work in connection with other real estate transactions involving Aldar or its predecessor companies. Foley and Daniels, however, never evidenced their agreement with a written retention or engagement letter. The purpose of hiring Daniels was so that Foley could have assistance in perfecting its security interest on the collateral mortgage. The court finds, however, that Foley was not as naive with respect to Louisiana law on security devices as it proposed at trial. Instead, Foley worked closely with Daniels, and in fact the court finds that Foley's attorneys were acting in the capacity of co-counsel. The attorneys at Foley had decades of experience between them, and while perhaps they were not originally familiar with the nuances of Louisiana law, they did research the legal issues presented to them. And in any case, Foley's attorneys were well-versed in the general nature of

security devices and perfection of security interests.

After execution of the October 1, 2002 revised fee agreement, Daniels began work on perfecting the collateral mortgage. On November 20, 2002, Daniels e-mailed draft documents relating to the collateral mortgage transaction to another Foley partner, Tom James ("James"). The court finds that James was acting as co-counsel with Daniels. As co-counsel, James reviewed the documents and made his revisions.

On November 19, 2002, Ralston received a settlement offer from Jefferson Downs' attorneys, which included approximately $1.35 million. On November 20, this court issued a ruling that practically terminated Aldar's case in the underlying antitrust suit. The court denied Aldar's attempt to file a fourth amended complaint. For purposes of this ruling, it suffices to say that the effect of the court's ruling was to limit Aldar's antitrust claim to an action under § 1 of the Sherman Act, and thereby denying an action under § 2. Jefferson Downs immediately recognized the shift in settlement leverage following the ruling. Its attorneys immediately contacted Foley to inform that it was revoking its settlement offer.

The major turn of events did not go unnoticed by Ralston and Lambert. While at one point Foley estimated the value of the case at around $20 million, it became evident that Aldar's case was worth much less. As a direct result, Foley picked up speed on finalizing the collateral mortgage transaction, and the court sees why. The value of Aldar's antitrust case was now less than Foley's legal bills. Foley severely misjudged the strength of its case. Thus Ralston and Lambert were faced with the possibility of not recovering Foley's fees. The court finds that Ralston and Lambert therefore decided to quickly finalize the collateral mortgage transaction to ensure that the debt was protected.

Thus the same day as the court's ruling, James, at the direction of Ralston and Lambert, made corrections to the drafts related to the collateral mortgage and e-mailed the revised documents to Aldar for signature that day. In his haste, James decided to leave Daniels out of any further discussions in finalizing the collateral mortgage transactions. Thus James did not carbon copy, or even inform, Daniels that he had sent final documents to Aldar for signature. Aldar, with full and independent advice from Ransome and RLF, signed the collateral mortgage documents and faxed copies to James that same day. Ransome, however, retained the original promissory and collateral mortgage notes. Moreover, Daniels was never informed that James had taken control as the closing attorney with respect to the collateral mortgage transaction.

The next relevant events occurred on December 3, 2002, when Jefferson Downs and Aldar agreed to settle the antitrust case for $550,000. That same day, James conducted legal research with respect to perfecting security interests in Louisiana. A billing entry for that day shows that James "research[ed] filing requirements in Louisiana of mortgages...." Again, James did not confer with Daniels. The court finds that Daniels was completely unaware of the finalization of mortgage documents occurring between James and Ransome. James researched which documents needed to be recorded in order to complete his role as closing attorney for Foley in its collateral mortgage transaction with Aldar. The same day, James contacted Vivian Ellis ("Ellis"), a paralegal at RLF, and instructed her as to which documents had to be recorded.

Aldar agreed to record the collateral mortgage documents with the clerk of

court in Livingston Parish on December 4, 2002. Ransome, however, retained the original promissory and collateral mortgage notes. Ransome was aware that in Louisiana, a collateral mortgage was not perfected until there had been actual delivery of the original notes to the mortgagee, in this case Foley.

Foley's contention that it was unaware that possession of the original notes was essential to perfection of the collateral mortgage seems dubious. Foley is a firm of experienced and sophisticated attorneys, and it routinely practices in security devices/commercial transactions. James researched the collateral mortgage requirements in Louisiana. In fact, he billed $727.39 for that research. The court finds that his research surely uncovered the requirement that possession of the original notes was essential to perfection.

But even if James was notable to uncover such an essential element through his $727 worth of research, the notes were made payable to "bearer." The court finds in particular that James' testimony as to his lack of understanding of the significance of bearer instruments to not be credible. James insisted his understanding of Louisiana law was limited, but it is common knowledge that bearer instruments are usually only enforceable by the holder. Thus the court finds that Foley, through James, knew that possession of the notes was essential. Moreover, the facts are that James was a partner in a major Washington D.C., law firm. He testified that he had over 20 years of experience in commercial transactions. When asked on cross-examination whether he understood the reference to the meaning of a "bearer instrument" as found in the Uniform Commercial Code, James was elusive and indicated that he did not fully understand what "bearer" meant. The court does not believe this could be possible.

Following Ellis' advisement that the documents had been recorded, Ralston contacted Daniels (this being Foley's first contact with Daniels since November 20, 2004, the date that James asserted himself as the closing attorney for the mortgage transaction), and asked Daniels, on December 4, 2002, to prepare an opinion letter and issue the title insurance. Daniels told Ralston that a closing on the collateral mortgage transaction needed to occur first. Of course, Daniels had no idea that James acted as closing attorney and closed the transaction because Daniels was left out of the loop by Foley. Ralston then informed Daniels that Foley had conducted the closing. Daniels next advised Ralston to record the documents, and again, Ralston's response was that Foley had recorded the documents through Ellis. Finally, Daniels advised Ralston "you must have the original notes." Ralston's response shows that Foley was well-aware that possession of the original notes was essential to perfection. Ralston replied, "we will take care of getting the original notes." To the extent that any other witnesses contradicted Daniels' recollection of these events, that testimony is rejected in favor of Daniels' testimony. The court finds that Daniels had no reason to believe that his client, a sophisticated law firm with over 1,000 attorneys, and one that acted as co-counsel and handled the closing of the transaction, would not do as it said it would and acquire the notes.

Daniels prepared a draft of the title opinion, and in it he included a statement that the obligee (Foley) must have possession of the original notes. On December 5, 2002, Daniels delivered a letter to Foley outlining his recommendations for further handling of the matter. He also enclosed a draft of the opinion letter to be held in escrow. Foley did not respond to the December 5 letter. On December 12, Daniels

delivered another letter to Foley in which he enclosed his revised opinion letter to be held in escrow, a revised pledge agreement to be approved and signed by Aldar, and enclosed another copy of the title insurance commitment and the invoice for the policy. Foley did not respond to the December 12 letter. On December 18, Daniels delivered yet another letter to Foley in which he enclosed a revised opinion letter to be held in escrow, the revised pledge agreement, and another copy of the invoice for title insurance. Daniels, fully expecting Foley to obtain possession of the notes, also invited Foley to discuss any outstanding issues. Although Foley never obtained possession of the notes, it never once alerted Daniels to that fact. Thus Daniels was left with Foley's representations on December 4 that the notes would be obtained.

Ransome was also aware of Louisiana law's requirement that possession of the original notes was essential to perfect a collateral mortgage interest. Nevertheless, Ransome emailed Ralston on January 17, 2003 and falsely assured him that Foley was protected by the value of the collateral land, even though she knew as an experienced Louisiana attorney that no perfected security interest existed. After all, the notes were in Ransome's desk at the RLF, not in Foley's possession. On April 23, 2003, Ransome sent an email to Ralston containing a proposed disbursement schedule for the settlement proceeds from the antitrust suit. The email proposed that Foley would receive some of the settlement proceeds from the second settlement installment only if Foley granted a partial release of the collateral mortgage. However, this was dubious. Ransome knew that Foley's mortgage was not then perfected and thus Foley actually had no interest to release. The negotiations between Ransome and Foley broke off some time after April 23, 2003 but before May 23, 2003.

All the parties to the settlement of the antitrust litigation except Aldar had signed the agreement by early February 2003. Aldar and Foley failed to reach an agreement on division of the settlement proceeds in favor of Foley's fees. Instead, Aldar, acting through Ransome, instructed Ellis to take the original collateral mortgage note to the clerk of the court and have it cancelled. Ransome stamped the note "cancelled," and on May 23, 2003, Ellis attempted to cancel the mortgage. The clerk, however, advised that the note would have to be marked "paid" in order to cancel the mortgage. Ellis received authority from Ransome to mark the note paid. Ellis did so, and the clerk cancelled the mortgage. One day later, Ransome agreed to the settlement terms in the antitrust litigation fully knowing that Foley no longer had an interest, let alone a perfected security interest, in Aldar's real estate.

On May 28, 2003, two new collateral mortgages were recorded affecting the same real estate owned by Aldar. On May 29, 2003, J. Marvin Montgomery, co-counsel for Aldar in the antitrust litigation, sent a letter to Ralston advising Foley for the first time that he and Aldar had executed a 20% contingency fee contract, dated nearly eighteen months earlier. Mr. Montgomery recorded the contract on that day. At no time during the antitrust case, or during negotiations of the revised fee agreement, did Ransome inform Foley about the contract between Aldar and Mr. Montgomery. At trial Ransome indicated that the contract was none of Foley's business. In response, Foley formally withdrew as counsel by letter dated July 3, 2003.

On June 11, 2003, Ralston first contacted the Baton Rouge law firm, Taylor Porter, pertinent to "efforts to reinstate and/or preserve the value of its lost second mort-

gage on the ... real estate owned by ALDAR...." Although fully aware that it no longer held an interest in Aldar's estate, Foley nonetheless issued a check for title insurance to Daniels on July 1, 2002. Daniels first learned of the cancellation of Foley's mortgage while running an abstract update on July 24, 2003. By then, however, the mortgage was cancelled, and Foley was aware of that fact.

Ultimately, Foley and two other creditors placed Aldar in involuntary bankruptcy on May 21, 2004. Aldar's property in Livingston Parish was sold by the bankruptcy trustee for $2.5 million pursuant to a court order dated October 14, 2005. After all expenses of the sale, payment of the first mortgage, property taxes, and other charges, a maximum of $886, 121.96 would have been available to pay Foley. All parties agree that this figure represents the maximum amount of damages, if any, that Foley may be entitled to in this case.

## CONCLUSIONS OF LAW

Jurisdiction in this case is based on diversity of citizenship, 28 U.S.C. § 1332, and therefore this court applies the *Erie* doctrine, which requires the court to apply state law on substantive matters. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Turknett v. Keaton,* 266 F.2d 572 (5th Cir.1959).

### A. *Foley's Legal Malpractice Claim Against Daniels*

■ In Louisiana, a client suing his or her attorney for legal malpractice must prove the following: (1) the existence of an attorney-client relationship; (2) negligent representation by the attorney; and (3) loss to the client caused by that negligent representation. *Costello v. Hardy,* 864 So.2d 129, 138 (La.2004); *Francois v. Reed,* 714 So.2d 228, 230–31 (La.Ct.App. 1998). In this case, there is no dispute

that Daniels and Foley were engaged in an attorney-client relationship and that Foley suffered a loss. Thus the questions that remain are: (1) did Daniels provide negligent representation? If, and only if, that answer is yes, then (2) did the negligent representation cause the loss to Foley? The court answers the first question in the negative, and thus does not reach the second.

■ In the present case, Daniels' representation of Foley was in conjunction with Foley's attorneys acting as co-counsel. The court finds the scope of Daniels' representation was limited to drafting initial documents relating to the collateral mortgage agreement. Foley acted by having James serve as the closing attorney, and Foley also acted by assuming responsibility, as co-counsel, for obtaining the original promissory and collateral mortgage notes. Any notion that Foley relied on Daniels to obtain the original notes is rejected. The court finds Daniels' testimony to be true, in that the agreement between himself and Foley was that Foley would obtain the original notes. Moreover, Foley was fully aware of all of the legal requirements for perfecting a collateral mortgage, as that information was obtained between its discussions with Daniels and its own independent research conducted in the capacity of co-counsel.

Moreover, the court is not persuaded by Foley's expert witness on the issue of legal malpractice. It instead agrees with the testimony of Daniels' expert, Randy Roussel. As Roussel testified, Daniels' scope of representation was limited by the actions of Foley in dealing directly with Aldar between November 22, 2002 and December 4, 2002. In this case, Foley took it directly upon itself to leave Daniels "out-of-the-loop" with respect to finalizing and closing the collateral mortgage transaction. James corresponded with Ransome direct-

ly and purposefully refrained from informing Daniels as to the actions he was taking. Thus Foley must accept responsibility for its conduct. It cannot now, after the fact, blame Daniels for failing to obtain the "bearer" notes. Putting aside the fact that possession of the original notes was essential not just to perfect a Louisiana collateral mortgage, but also to enforce a promissory note made payable to bearer, Ralston, acting on behalf of Foley, assured Daniels that Foley would obtain the notes.

■ Foley, in its rush to close the collateral mortgage transaction, however, looked over something so fundamental as possessing bearer notes. But this was not due in any part to the actions of Daniels. "A tort-feasor is only liable for damages caused by his negligent act; he is not liable for damages caused by separate, independent, or intervening causes." *Haydel v. Hercules Transp., Inc.*, 654 So.2d 418, 432 (La.Ct.App.1995). In the end, Foley was left with an unperfected security interest in Aldar's property because it dropped the ball, not because of any actions or inactions on the part of Daniels.

Accordingly, as to Foley's claim of malpractice, the court enters judgment in favor of Daniels and against Foley. In light of the ruling, the court need not examine Daniels' alternative defenses.

### B. Foley's Fraud Claim Against Ransome and RLF

Under La. Civ.Code Art.1953, "[f]raud is a misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." The two essential elements to establishing legal fraud are intent to defraud or gain an unfair advantage and a resulting loss or damage. *La. Pigment Co., LP. v. Scott Const. Co., Inc.*, 945 So.2d

980, 983–84 (La.Ct.App.2006). Moreover, "[she] who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act." La. Civ. Code Art. 2324(A).

■ The Fifth Circuit has set forth the following elements to sustain a claim for fraud under Louisiana law: (1) a misrepresentation of material fact; (2) made with the intent to deceive; and (3) causing justifiable reliance with resultant injury. *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1131 n. 33 (5th Cir.1988), *vacated on other grounds sub nom., Fryar v. Abell*, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989). While a fraud claim based on unfulfilled promises or statements as to future events will not satisfy the justifiable reliance requirement, a claim of fraud may be predicated on promises made with the intention not to perform at the time the promise is made. *Sun Drilling Prods. Corp. v. Rayborn*, 798 So.2d 1141, 1152 (La.App.2001).

" 'It has been consistently held under Articles 3371 and 3372 of the [La. Civ. Code] that a mortgage or lien can be cancelled only with the consent of the holder of the mortgage or mortgage note or notes, or by virtue of a judgment rendered against him ordering the cancellation.' " *Nat'l. Acceptance Co. of Am. v. Wallace*, 194 So.2d 194, 202 (La.Ct.App.1967) (quoting *Bornes v. Vernon*, 64 So.2d 18, 20 (La.Ct.App.1953)).

■ In the case at bar, the court finds that Aldar entered into a revised fee agreement with Foley on October 1, 2002. At the time of executing the October 1 agreement, Ransome and RLF, acting on behalf of Aldar, and Foley agreed that the revised fee agreement would be a final, and not temporary, agreement. The court rejects the testimony by Ransome to the

effect that the October 1 agreement was merely an interim agreement for Ralston to take to the managing committee at Foley. Instead, the court finds that Ransome promised to give Foley a perfected security interest in Aldar's real estate. This Ransome did not do.

In this case, Ransome and RLF participated in the fraud perpetrated against Foley by ordering Ellis to cancel the collateral mortgage without making good on her obligations under the October 1 agreement. Moreover, after Ransome knew that the mortgage had been extinguished, she continued to misrepresent to Foley that the mortgage was still valid. In doing so, Ransome acted intentionally in convincing Foley that Foley's unpaid legal fees were protected by a mortgage she knew was worthless. In addition, Ransome also withheld from Foley the material fact that Mr. Montgomery had a 20% contingency fee contract with Aldar. When Ransome and Foley executed the October 1, 2002 revised fee agreement, Ransome knew that Foley might not get paid in full from any settlement or judgment, as the agreement contemplated, because of the contract with Mr. Montgomery. Incredibly, at trial Ransome suggested that the reason that she did not inform Foley of her contract with Mr. Montgomery was because that contract was none of Foley's business.

With respect to the mortgage cancellation, Foley was the party that was armed with far less than perfect information, not Ransome. In fact Foley continued to provide legal support for Aldar instead of withdrawing from the antitrust litigation, as it had the right to do. Ransome continued to request legal assistance, and at the same time refrained from delivering the notes. Thereafter it was to Ransome's personal advantage to misrepresent the paid status of the mortgage notes in order to cancel the mortgage. Doing so cleared the way for Ransome to obtain monies by pledging the land to another second mortgage creditor. Ransome made material misrepresentations of facts, intended to deceive Foley, and caused Foley to justifiably rely on her assurances, which in turn caused Foley to lose a mortgage worth hundreds of thousands of dollars.

The court rejects the purported defense that possession of the collateral mortgage note alone was tantamount to authorization to cancel the collateral mortgage. In *Walmsley v. Resweber*, 105 La. 522, 30 So. 5 (1899), the Louisiana Supreme Court held that where a mortgagor executed a mortgage to secure the payment of six notes, and delivered only two of the notes, retaining four in his possession, and afterwards executed a mortgage in favor of a third person, he could not, after executing the latter mortgage, place the notes in circulation to the prejudice of the latter mortgagee. An important principle to take from *Walmsley* is that when a mortgagor is obliged to deliver notes to the mortgagee, the refusal to do so does not give the mortgagor all rights associated with being a holder. Indeed, in such a case, the mortgagor is a holder only through breach of the agreement.

In this case, Ransome's possession of the notes was unauthorized. She was well-aware that Foley would be unprotected without possession of the notes. She continued to hold onto the notes. While Foley should have known that possession of the notes was essential to protect its interests, Ransome was obliged under the revised fee agreement to deliver the original notes. No protected interest would result in the absence of doing so. Moreover, Ransome's order to Ellis to mark the notes as paid was fraudulent because she knew that (1) Foley was the rightful owner of the notes; (2) the indebtedness secured

by the notes had not been paid; and (3) she had no authority from Foley to direct Ellis to mark the notes as paid.

■ Furthermore, the court rejects Ransome's argument that she entered into the October 1 revised fee agreement under duress. Duress results when a person makes an improper threat that induces a party who has no reasonable alternative to manifest her assent. *Reimonenq v. Foti,* 72 F.3d 472, 477–78 (5th Cir.1996); *Wolf v. La. State Racing Comm'n,* 545 So.2d 976, 980 (La.1989). The court finds that Ransome executed the October 1 agreement, on behalf of Aldar, without any coercion. The reason being that Ransome wished to have Foley continue to provide legal services in the antitrust case. Ransome was unable to pay Foley's fees up to that point.

■ Finally, the court finds that Foley did not violate the rules of professional conduct/ethics during its representation of Aldar. The court finds that all that occurred was a standard negotiation between Aldar and Foley with respect to the payment of fees. Aldar was represented by Ransome during this negotiation process, even though Ransome was the sole owner and president of Aldar. She acted in the role of independent counsel to Aldar's interests. The court finds it inequitable to rescind the October 1 agreement on the basis of any purported ethical issues. In fact, it is Ransome's ethics that this court stresses were sub-par. Nullifying the October 1 agreement would reward the very party who made multiple misrepresentations and overreached. It seems incredulous for Ransome to argue that Foley committed ethical violations warranting nullification of the contract— when she wanted Foley to continue representation of the antitrust suit, she negotiated a revised fee agreement on behalf of Aldar, and then she cancelled the mortgage without fulfilling her duties under the contract.

Accordingly, the court finds that the defendants Ransome and RLF are liable to Foley for the fraud perpetrated against it, and hereby enters judgment in favor of Foley on its claim for fraud. La. Civ.Code 1953; La. Civ.Code 2324(A).

## C. Damages

All parties have stipulated that the maximum amount of allowable damages recoverable by Foley is $886,121.96. The defendants first contend that this amount is inflated because it includes an illegal seven percent contingency fee on the $550,000 settlement of the underlying antitrust litigation. The October 1 revised fee agreement provided that Foley would receive a seven percent contingency fee from the settlement proceeds.

■ The defendants maintain that the contingency fee provision is usurious. However, contingency fee contracts are routinely used, and they are enforceable. *See Hall v. St. Paul Fire & Marine Ins., Co.,* 868 So.2d 910 (La.Ct.App.2004). Nevertheless, it is well-settled that a prohibition against unreasonable attorney's fees exists in Louisiana, and such prohibition cannot be abrogated by a valid contingency fee contract. *Succession of Cloud,* 530 So.2d 1146, 1150 (La.1988); *Cent. Progressive Bank v. Bradley,* 502 So.2d 1017, 1017 (La.1987). Irrespective of the contractual arrangement between the client and the attorney, the courts have the right to review contingency fee contracts to determine whether the fee is excessive. *State of Louisiana, Dep't. of Transp. & Dev. v. Williamson,* 597 So.2d 439, 441 (La.1992). The court's focus is on whether the amount of fees is "reasonable." *La. Rules of Prof. Conduct,* 1.5.

■ Contingency fee contracts serve an important role in making legal services available to those without sufficient financial resources. *Saucier v. Hayes Dairy Prods., Inc.,* 373 So.2d 102, 105 (La.1978). However, a contingency fee contract, to be valid, must be "a contract for legal services in which the attorney's fee *depends upon success* in the enforcement of the client's claim." *Town of Mamou v. Fontenot,* 816 So.2d 958, 966 (La.Ct.App.2002). With contingency fee contracts, the attorney must bear the risk of loss insofar as legal services are concerned. *Id.*

■ In the case at bar, the additional seven percent contingency fee inserted into the October 1 revised fee agreement was not reasonable. The revised fee agreement provided for payment to Foley *regardless of the outcome of the case.* Foley did not bear the risk of loss insofar as legal services were concerned. Nor were Foley's fees dependant upon success in the enforcement of Aldar's antitrust claims. As the October 1 agreement stated, the purpose of the seven percent contingency fee was "to compensate [Foley] for the risks associated with the restructuring of the Fee Agreement and the delay in payment." *See Joint Exhibit 31.*

The seven percent contingency fee in effect is a sort of penalty against Aldar for renegotiating the fee agreement. In this case, the revised fee agreement provided for the payment of legal fees to Foley through the use of a collateral mortgage. The court fails to understand how an additional seven percent contingency fee was necessary to compensate Foley *for its work on the underlying antitrust litigation.* The court believes that inclusion of the seven percent contingency fee represented Foley's attempt to obtain compensation for work on negotiating a fee agreement with Aldar—it had nothing to do with compensation on legal services

provided in the antitrust litigation. Allowing Foley to recover the additional seven percent fee is therefore unreasonable. Accordingly, the court sustains the defendants' objections to the seven percent contingency fee. The total settlement in the underlying antitrust litigation was $550,000. Therefore Foley's fees must be reduced by $38,500 ($550,000 X 7%).

The defendants have also stated objections to certain other charges for fees by Foley. The objections pertain to Foley's billing records found in *Joint–Exhibits—* 123 A–E. First, the charges found in *Joint–Exhibits* 123 C, D have been voluntarily withdrawn by Foley because those charges, like the seven percent contingency fee, represent fees for work done on negotiating the October 1 revised fee agreement. The defendants maintain objections to *Joint–Exhibits* 123 A (work conducted on Aldar's antitrust claims); 123 B (work done with respect to motions for summary judgment in antitrust case); and 123 E (work done post-settlement of antitrust case). The court has reviewed the billing records, and finds the amounts charged to reasonably reflect the work conducted.

With respect to Foley's work on researching Aldar's Sherman-antitrust claims, Foley was faced with a myriad of legal and factual hurdles in pursuing its intra-corporate conspiracy argument. After this court disagreed with its reasoning, Aldar chose to have Foley complete a complex motion for reconsideration, and a motion for leave to file a fourth amended complaint (which was ultimately denied by this court). After the court dismissed Aldar's Sherman I claim, it requested that Foley pursue a Sherman II claim. In the absence of doing so, Aldar's entire case would have come to an end. The billing charges found in *Joint–Exhibit* 123 A reasonably represents the costs of pursuing

the Sherman II claim. Finally, the court has reviewed the billing records found in *Joint–Exhibits* 123 B, E, and finds them to reasonable represent the costs incurred by Foley.

 Finally, Foley's claim for attorney's fees in the present case is hereby denied. Attorneys fees are only provided in Louisiana when authorized by contract or by statute. *Coates v. Anco Insulations, Inc.,* 786 So.2d 749, 755 (La.Ct.App.2001). The Louisiana fraud article, La. Civ.Code Art.1953, does not by its own terms authorize an award of attorney's fees. In order to obtain attorney's fees, Foley must rely on La. Civ.Code Art.1958, which provides, "[t]he party against whom recision is granted because of fraud is liable for damages and attorney fees." The analysis in Coates is applicable to this case, in that Foley has "not asserted claims under the conventional obligations or sale provisions of the civil code." *Coates,* 786 So.2d at 756. "The civil code provides for attorneys' fees not for all cases of fraud, but only for those for which the remedy is recision." *Id.* In the case at bar, Foley does not seek to rescind the October 1 agreement. Instead, it seeks enforcement of the contract. Accordingly, attorney's fees are unwarranted.

## CONCLUSION

It is hereby ordered that in the matter of *Foley v. Aldar, et al* (No. 03–760), judgment be entered in favor of Foley and against Ransome and RLF. Damages for fraud in the amount of *$847,621.96* ($886,121.96–$38,500) is entered against Ransome and RLF.

It is further ordered that in the matter of *Foley v. Daniels, et al* (No. 04–866), judgment be entered in favor of Daniels and Daniels, L.L.C. and against Foley.

Finally, it is ordered that Foley's claims for attorney's fees are hereby denied.