ROLAND L. BELSOME, Judge.
 

 | iDefendant-Appellant Keith Barthele-my appeals his life sentence for the second degree murder of Troy Cacioppo. For the reasons that follow, we affirm Defendant’s conviction and sentence.
 

 FACTS AND PROCEDURAL HISTORY
 

 A grand jury originally returned a true bill, charging Danny Scott and Defendant-Appellant, Keith Barthelemy, with the first degree murder of Troy Cacioppo on October 31, 2002. Danny Scott pled guilty to a reduced charge of manslaughter in exchange for his testimony at Defendant’s trial. The State subsequently reduced Defendant’s charge to second degree murder.
 

 Defendant pled not guilty at his arraignment on November 8, 2002, at which time Sonny Armond appeared as his attorney for arraignment purposes only. A November 15, 2002 hearing to appoint counsel resulted in the appointment of Sonny Ar-mond and Dwight Doskey, both of the Orleans Indigent Defense Board, as Defendant’s counsel. Also at that hearing, Kerry Cuccia was appointed to represent Danny Scott.
 

 On July 25, 2008, Defendant filed a Motion in Limine to Exclude Testimony of Co-Defendant Danny Scott Due to Conflict of Interest, asserting that Dwight 12Doskey’s work with the Capital Defense Project of Southeast Louisiana after Hur
 
 *1002
 
 ricane Katrina created a conflict of interest, because Kerry Cuccia worked for the same organization. The trial court heard testimony from Mr. Doskey on this matter at a July 30, 2008 hearing and denied the motion on August 18, 2008.
 

 A five-day jury trial resulted in a guilty verdict. After a November 5, 2008 sentencing hearing that included victim impact statements, Defendant was sentenced to life in prison, without the benefit of probation and parole. This appeal follows.
 

 At trial, Crystal Smith, an acquaintance of Troy Cacioppo who was with Troy on the evening of the murder, testified and provided an account of the night’s events. On the evening of August 27, 2002, Ms. Smith ran into Mr. Cacioppo on Bourbon Street, where the two exchanged numbers. Later that evening, Ms. Smith called Mr. Cacioppo from a restaurant in Metairie and requested a ride. Mr. Cacioppo picked Ms. Smith up, and the two drove to the lakefront, at Lakeshore Drive, got out of the car and chatted. Shortly thereafter, Ms. Smith observed two teenage boys approach. She estimated their ages to be around sixteen years.
 

 The boys requested a light, and Mr. Cacioppo provided one. Mr. Cacioppo then asked if they had marijuana, and small talk ensued. Ms. Smith then observed Defendant take a firearm from his waistband, point it at Mr. Cacioppo, and demand his car keys, which were in the ignition. After Mr. Cacioppo refused, Ms. Smith testified that Defendant shot Mr. Cacioppo in the neck.
 
 [1]
 
 As he choked on his own blood, Mr. Cacioppo looked at Ms. Smith, pleading for help, lying upside down on the seawall steps, his head near the water. Defendant walked down the steps and |sshot at Mr. Cacioppo again, but missed. Defendant then demanded his car keys again; however, Mr. Cacioppo was choking on his own blood and could not respond. Defendant shot at Mr. Cacioppo a third time; this shot hit him. Ms. Smith testified that she saw Mr. Cacioppo’s eyes as he died.
 
 [2]
 

 Defendant then turned to Ms. Smith, threatening to kill her as well, at which time Ms. Smith ran away, crossing Lake-shore Drive, and heard the car drive off soon thereafter. Ms. Smith testified that she eventually made it to a house where the occupants called the police while she waited outside.
 
 [3]
 
 The police arrived approximately five minutes later.
 

 Ms. Smith returned to the lakefront with
 
 *1003
 
 the responding officers. Several casings
 
 [4]
 
 and a Jesus Medallion that Troy had worn were recovered at the crime scene, and Mr. Cacioppo’s body was recovered from the water. Detective Troy Williams subsequently took Ms. Smith to the police station, where she provided her account of what had occurred. The next day, Ms. Smith provided a description of the shooter — Defendant—to a sketch artist.
 

 At trial, Ms. Smith expressed some confusion over the timing of two photographic lineups that were presented to her. She was presented one lineup while at the police station, immediately after the shooting, and was presented | ¿another lineup while she was at work. Though she did not know his name at the time of the identification and did not remember the timing of the identification, Ms. Smith testified that she had no doubt that Defendant was the shooter. She explained in court that “I’ll never forget that face or his eyes.”
 
 [5]
 

 On cross examination, Ms. Smith admitted that she may have smoked marijuana earlier in the day on the date of the murder. When asked about answering negatively to the question, “[i]s that the first time you ever met [Mr. Cacioppo],” Ms. Smith explained that she may not have understood the question, which was asked during testimony before the grand jury. Ms. Smith further testified that she was interviewed by Detective Troy Williams at approximately 6:00 a.m. on the morning after the shooting. At that time, she described one of the boys as taller and darker than Defendant, the shooter. Ms. Smith admitted that she could have been mistaken about heights and ages, as she had previously indicated that Defendant was a little shorter. Ms. Smith affirmed that she had described the shooter as being 5'2" tall and young, close to sixteen years old.
 

 Homicide Detective Troy Williams investigated the murder of Troy Cacioppo. Det. Williams testified that when he arrived on the scene, Mr. Cacioppo’s body had been recovered and placed face up on the seawall. Sergeant Scanlan
 
 [6]
 
 was the first officer on the scene and briefed him. Det. Williams learned from Officer Jamie Freeman that a couple was sitting in a vehicle not far from the crime scene when the murder occurred. Upon interviewing the couple, Det. [ ¡Williams learned that they drove away when they heard gunshots. As they drove away, they observed two individuals fleeing. The female “was
 
 *1004
 
 pretty sure” the fleeing suspects were male. The male could not make a determination. Both observed two cars flee; the female thought they were driving a Pontiac Grand Prix with large chrome wheels and a lighter colored Oldsmobile Cutlass. Neither witnessed the shooting.
 

 Det. Williams testified regarding his interview with Ms. Smith at the police station. Ms. Smith relayed her story of running into Mr. Cacioppo, exchanging numbers, and driving to the lakefront, where they sat and talked. Two black males approached, and a short conversation took place. Then, one of the males produced a gun and demanded the car keys. Mr. Cacioppo refused to comply, and the male with the gun shot him. The other male told Ms. Smith not to run, or she would be killed too. Mr. Ca-cioppo fell partially into the water, and the gunman continued demanding the car keys while rummaging through his pockets. Ms. Smith heard another shot and fled to a house in Lake Vista, where the first responding officers encountered Ms. Smith.
 

 Det. Williams further testified that Ms. Smith described the two males as two young black males, wearing blue jeans and white t-shirts. One was taller than the other and one was armed. Det. Williams subsequently took Ms. Smith to a sketch artist, at which time sketches were made of both perpetrators. An additional sketch was made just of their figures, to show the slight height difference between the two of them.
 

 ),;Ms. Smith advised Det. Williams that her cell phone was in Troy’s car when it was stolen. When the cell phone provider was contacted, it was discovered that several calls were made to Ms. Smith’s phone after the shooting. The phone records also showed that a call was made from Ms. Smith’s phone to a number that had called her phone. A call had been made from Ms. Smith’s phone to a number listed to the name, “Danny Scott,” at approximately 5:37 a.m. The number belonged to Danny Scott, Sr., but Danny Scott, Jr. lived at the same address. A search of that name produced a Danny Scott who was fifteen or sixteen years of age. Another number was connected to a Carondolet Street address in Uptown. The occupant of the Carondolet Street address had returned a call from Ms. Smith’s phone number.
 

 After receiving Mr. Cacioppo’s car information from his mother and step-brother, Det. Williams had this information broadcast by police communications. Troy drove a green Pontiac Grand Prix.
 
 [7]
 
 Det. Williams was informed that a car fitting the description was discovered next to a Selma Street address, in New Orleans East. The police department was also informed that the same vehicle was seen in the rear yard of 4851 Viola Street, and received information that a person driving a white Mustang was seen attempting to strip or remove the vehicle discovered on Selma Street. The Grand Prix was damaged; the stereo and other items were missing. It was identified as Mr. Caciop-po’s car by the VIN number.
 
 [8]
 

 
 *1005
 
 |7WhiIe Mr. Cacioppo’s car was being recovered, the white Mustang was also seen at a towing business on Chef Menteur Highway. A man was seen exiting the Mustang and getting into a nearby pickup, where he conversed with another man. The driver of the Mustang was an individual by the name of Harold Green. The other man in the pickup was Kim Evac. Mr. Evac had been called about moving Troy’s car from Viola Street, but did not want to get involved. After the police interviewed Mr. Green, a warrant to search 4851 Viola Street was obtained.
 

 Execution of the warrant at 4851 Viola Street produced the following evidence: several stereo components, a pistol box, some ammunition, and a wallet found in the top dresser drawer in a bedroom. The wallet contained items marked with Troy Cacioppo’s name. The bedroom was that of Lakeisha Williams. As a result of talking to Ms. Williams, Det. Williams learned that Mr. Cacioppo’s car had been driven to the Viola Street address and placed in the back yard by “Keith” or “Danny.” Scott had apparently placed the wallet in Ms. Williams’ room. Danny Scott was approximately fifteen or sixteen years old and had lived uptown.
 

 Det. Williams subsequently developed a photographic lineup with Danny Scott in it, and presented it to Ms. Smith on August 29, 2002. Ms. Smith identified Danny Scott as the subject who had threatened she would be killed if she ran. Scott was arrested shortly thereafter.
 

 At the Juvenile Intake Center at police headquarters, Scott’s father was called and requested to come to the station. Once Scott’s father arrived, both were informed that Scott was being charged with first degree murder, and Scott was advised of his constitutional rights. While Det. Williams spoke to Danny Scott and |sMr. Scott, another officer developed information on the Defendant. A photographic lineup was then prepared, and Det. Williams and Sergeant Waguespack proceeded to Ms. Smith’s place of employment, where they showed her the lineup. She immediately identified Defendant as the person who shot and killed Mr. Caciop-po.
 

 At the time of his arrest, Defendant was 5'5" tall and weighed approximately 150 pounds, and was twenty-one years old. Scott was slightly shorter and skinnier at the time of his arrest — 5'4" tall and approximately 125 pounds.
 

 On cross examination, Det. Williams was asked about Ms. Smith’s August 28, 2002 statement within a few hours of the incident. Det. Williams acknowledged that on August 28, 2002, Ms. Smith had described the shooter as
 
 5'21'
 
 in height and young, sixteen, and described the non-shooter as taller and darker.
 

 Danny Scott, who was sixteen years old at the time of the murder, also testified at trial. Scott testified that Reginald Williams and Defendant picked him up at his home on Bullard Avenue in New Orleans East just before midnight on August 28, 2002. Although Scott had known Williams for four or five months, he met Defendant for the first time on the night of the murder.
 
 [9]
 
 Williams drove the three of them to the lakefront at approximately
 
 *1006
 
 three or four in the morning to search for drugs.
 

 Scott testified that when they arrived at the lakefront, Williams admired another car there as the three of them sat on the hood of Williams’ car. Defendant and Scott then walked over to a man and a woman who were parked approximately half a street block to a full street block away to request a light while Williams ^remained in his car, talking on the phone. As they approached the couple, the man touched Scott on the bottom of his pants leg and asked whether he had marijuana. At that time, Defendant requested a light, and as the man produced a lighter, Defendant removed a gun — a .380 — from his back pocket, and demanded the man’s car keys. Scott testified that when the man refused, Defendant shot him, at which time the man fell, leaving half of his body in the water. Shocked, Scott testified that he took several steps back into the street; he knew that Defendant had a gun, but did not anticipate this turn of events.
 
 [10]
 
 The woman ran away. Scott testified that Defendant continued to demand car keys from the male victim, rummaging through the male victim’s pockets. Defendant then shot the victim a second time and proceeded to the car that had been occupied by the victim and the woman. Scott returned to Williams’ vehicle, and Defendant followed them in the victim’s car.
 

 From the lakefront, Williams and Scott drove to Williams’ house on Viola Street, in New Orleans East. Approximately half an hour to an hour later, Defendant arrived at Williams’ house in the victim’s car, driving it into the backyard, where it got stuck in the mud.
 
 [11]
 
 Shortly thereafter, Williams’ mother arrived and demanded to know about the car in the back yard. Scott informed her that Defendant had shot a man at the lakefront and brought his car to her house. Williams’ mother called a tow truck immediately. When the truck arrived, Defendant attempted to negotiate a sale of the car’s rims to the driver; the driver refused and took the car at Ms. Williams’ insistence. Williams then drove Scott home at approximately 6:30 a.m.
 

 l,nThat morning, Scott testified that he took a bath and went to school, where his conscience bothered him, and he told several teachers about the murder. At approximately noon, the police came for Scott. Scott ran from the officers, but was arrested
 
 [12]
 
 a block away from his school and taken to the Juvenile Bureau, where he gave a statement to the police.
 
 [13]
 
 Scott denied knowledge of a call made from the female victim’s cell phone to his father’s house; denied ever touching the cell phone, a backpack in the vehicle, or the victim’s wallet.
 
 [14]
 

 Reginald Williams also testified at trial. Williams did not know Scott well, but had Imown Defendant since he moved to New Orleans East, approximately thirteen or fourteen years prior to trial, and admitted
 
 *1007
 
 that Defendant was “something like my best friend.”
 
 [15]
 
 Williams testified that he drove his car to the lakefront with Scott and Defendant on the night of the murder. At some point after they reached the lakefront, Williams received a phone call and got back into his car, while Scott and Defendant walked off together. Williams testified that he subsequently heard gunshots and ended his phone conversation, started his engine and was about to drive off when he saw Defendant run towards his car, enter the vehicle and relate that Scott was attempting to rob someone. Williams further testified that he saw Scott drive away in the victim’s vehicle.
 

 Williams drove Defendant to his aunt’s house on Poland Avenue, but no one was at the Poland Avenue house, so the two boys drove to Reginald’s home at 4851 Viola Street. Williams’ sister, Lakeisha, was there with her boyfriend when luthey arrived. After Williams told Scott where he was, Scott drove the victim’s car to Williams’ house. When Williams’ mother returned home, Scott told her that the car belonged to his uncle.
 

 Williams testified that he subsequently saw a news story on television about a murder at the lakefront that showed the victim’s car. Williams asked Scott about the story, and Scott admitted to shooting the victim, but denied knowing that he had killed the man. Williams testified that Scott said he would take responsibility for the murder, and that Defendant, Ms. Williams, and Lakeisha were present when Scott made this statement. Williams maintained that Defendant was innocent.
 

 Williams was aware that the police discovered a wallet in his sister’s bedroom, and explained that Scott washed his clothes while at his house after the murder, as they had gotten dirty when the stolen vehicle became stuck in the mud. Williams testified that his sister Lakeisha washed Scott’s uniform because he had to go to school the next morning. When confronted with his own phone number on Ms. Smith’s cell phone bill, Williams testified that he did not make a telephone call to Ms. Smith, but stated that he received a call from Scott the morning after the murder, and that he ■ did not know Scott’s telephone number.
 

 Williams acknowledged that he pled guilty to being an accessory after the fact to the August 28, 2002 murder.
 

 ERRORS PATENT
 

 A review of the record evidences no errors patent.
 

 DISCUSSION
 

 ASSIGNMENT OF ERROR NUMBER 1
 

 Defendant asserts that the trial court erred in denying his Motion in Li-mine to Exclude Testimony of Co-Defendant Danny Scott due to Conflict of Interest |12because one of Defendant’s attorneys, Dwight Doskey, worked for the Capital Defense Project after Hurricane Katrina at the same time that Danny Scott’s attorney, Kerry Cuccia, worked for the Capital Defense Project.
 

 It is indisputable that Scott testified against Defendant at trial and that their interests conflicted.
 
 [16]
 
 Defendant makes no allegation, however, that Mr. Doskey actively participated in Scott’s representation or worked on his plea bargain with the State. Rather, Defendant relies upon Rule 1.9(a) of the Louisiana Rules of Pro
 
 *1008
 
 fessional Conduct,
 
 [17]
 
 which prohibits a lawyer from representing other parties “in the same or a substantially related matter in which that person’s interests are materially adverse.” Defendant further asserts that Mr. Cuccia should have ceased representing Scott when Mr. Doskey began working for the Louisiana Capital Defense Project. The State argues that Rule 1.9 does not apply because Mr. Doskey never represented Scott.
 

 Both this Court and the Louisiana Supreme Court have held that the Rules of Professional Conduct have the effect of substantive law.
 
 State v. Gilliam,
 
 98-1320, p. 25 (La.App. 4 Cir. 12/5/99), 748 So.2d 622, 637
 
 (citing Succession of Cloud,
 
 530 So.2d 1146 (La.1988)). In
 
 Gilliam,
 
 however, this Court found that improperly admitted evidence in connection with an ethical violation was harmless 11 (¡error.
 
 Gilliam,
 
 98-1320, p. 29, 748 So.2d at 639. Accordingly, pursuant to
 
 Gilliam, supra,
 
 we find that a harmless error
 
 [18]
 
 analysis should be applied to evidence admitted at a criminal trial in violation of the Rules of Professional Conduct.
 
 [19]
 

 See id.
 

 In this case, Mr. Doskey testified that he never discussed the matter with Mr. Cuccia. Defendant does not dispute this assertion, nor has Defendant claimed any prejudice from the alleged violation of the Rules of Professional Conduct. The record does not evidence that Mr. Doskey’s working for the Capital Defense project, after withdrawing as Defendant’s attorney, contributed in any way to Defendant’s conviction. Scott made a deal with the State to testify against Defendant. Mr. Doskey played no role in this deal. Therefore, a
 
 *1009
 
 violation of Rules 1.9 and 1.10, if any, is harmless beyond a reasonable doubt.
 

 Likewise, Defendant’s allegation that a conflict of interest existed bears no merit as a constitutional claim. As a constitutional claim, conflict of interest claims are based on a defendant’s right to effective assistance of counsel pursuant to the Sixth Amendment to the U.S. Constitution and La. Const. Art. 1, Section 13. Generally, a defendant alleging this right has been violated “must demonstrate ‘a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.”
 
 Mickens v. Taylor,
 
 535 U.S. 162, 166, 122 S.Ct. 1237, 1240, 152 L.Ed.2d 291
 
 (2002)(quoting Strickland v. Washington,
 
 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). However, where assistance of counsel is denied
 
 entirely
 
 at a critical stage of a proceeding, no prejudice need be shown.
 
 Mickens,
 
 535 U.S. at 166, 122 S.Ct. at 1241. In certain situations, a conflict of interest between attorney and client provides such an exception to
 
 Strickland, supra,
 
 and may warrant a reversal of conviction without a showing of prejudice.
 
 Id.
 
 Accordingly, although multiple representations are not
 
 per se
 
 illegal, they may violate the right to counsel in certain instances where a conflict of interest is present.
 
 State v. Kahey,
 
 436 So.2d 475, 484 (La. 1983).
 

 The U.S. Supreme Court previously held that when a trial court improperly requires joint representation over a timely objection, reversal was automatic.
 
 Holloway v. Arkansas,
 
 435 U.S. 475, 488, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978). In
 
 Holloway,
 
 each of defense counsel’s three clients chose to testify at trial. Defense counsel asserted that he would be unable to cross examine the defendants because he had received confidential information from them.
 
 Id.,
 
 435 U.S. at 478, 98 S.Ct. at 1175. The Court agreed that defense counsel was subject to conflicting obligations to his three clients.
 
 Id.
 
 435 U.S. at 490, 98 S.Ct. at 1181. In support, the Court cited
 
 Glasser v. United States,
 
 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) (abrogated by
 
 Bourjaily v. U.S.,
 
 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)), a case in which defense counsel (representing defendant Glasser) immediately objected when the trial court appointed him to defend the second of five codefendants, Kretske, in a conspiracy case.
 
 Holloway,
 
 435 U.S. at 481, 98 S.Ct. at 1177. The Court recognized that although relief was afforded to Glasser, his codefendant, Kretske, was not entitled to the same relief because he never | ^raised his own “Sixth Amendment challenge to the joint representation.”
 
 Holloway,
 
 435 U.S. at 489, 98 S.Ct. at 1181.
 

 The Supreme Court revisited
 
 Glasser
 
 and
 
 Holloway
 
 in
 
 Cuyler v. Sullivan,
 
 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), while addressing a conflict of interest claim that was not raised until post conviction proceedings. In
 
 Cuyler,
 
 the Court held that a trial court has no duty to inquire into possible conflicts of interest whenever an attorney represents multiple defendants unless the trial court knows, or reasonably should know, that a particular conflict exists.
 
 Cuyler,
 
 446 U.S. at 347, 100 S.Ct. at 1717. The Court found that “a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer’s performance.”
 
 Id.,
 
 446 U.S. at 348, 100 S.Ct. at 1718.
 
 [20]
 

 
 *1010
 
 In
 
 Mickens v. Taylor,
 
 the Supreme Court considered its previous decisions in
 
 Cuyler
 
 and
 
 Holloway
 
 in determining whether a trial court’s failure to inquire into a potential conflict of interest about which it knew or reasonably should have known violated the Sixth Amendment.
 
 Mickens v. Taylor,
 
 535 U.S. at 164, 122 S.Ct. at 1239. The Court recognized that
 
 Holloway
 
 “ereate[d] an automatic reversal rule only where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined there is no conflict.” 535 U.S. at 168, 122 S.Ct. at 1242. However,
 
 Cuyler
 
 “declined to extend
 
 Holloway’s
 
 | lflautomatic reversal to [the scenario in
 
 Cuyler
 
 ] and held that, absent objection, a defendant must demonstrate that ‘a conflict of interest actually affected the adequacy of his representation.’ ” 535 U.S. at 168, 122 S.Ct. at 142
 
 (quoting Cuyler,
 
 446 U.S. at 347, 100 S.Ct. at 1708). The Mick-ens Court additionally noted the distinction between special circumstances and merely potential conflicts arising in multiple representation:
 

 In addition to describing the defendant’s burden of proof,
 
 [Cuyler v.] Sullivan
 
 addressed separately a trial court’s duty to inquire into the propriety of a multiple representation, construing
 
 Holloway
 
 to require inquiry only when ‘the trial court knows or reasonably should know that a particular conflict exists,’ [citation omitted] — which is not to be confused with when the trial court is aware of a vague, unspecified possibility of con-
 

 flict, such as that which ‘inheres in almost every instance of multiple representation.’ [Citation omitted]. In
 
 [Cuyler v.] Sullivan,
 
 no “special circumstances” triggered the trial Court’s duty to inquire. [Citation omitted.].
 

 535 U.S. at 168-9, 122 S.Ct. at 1242 (emphasis added).
 

 Finally, the
 
 Mickens
 
 Court referenced
 
 Woods v. Georgia,
 
 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981), wherein the Court remanded a case to determine whether “an actual conflict of interest existed” with counsel paid for by the defendants’ employer.
 
 Mickens,
 
 535 U.S. at 170, 122 S.Ct. at 1243
 
 (quoting Woods,
 
 450 U.S. at 273, 101 S.Ct. at 1097). In considering the remand instruction, the Court determined that “ ‘an actual conflict of interest’ meant precisely a conflict
 
 that affected counsel’s performance
 
 — as opposed to a mere theoretical division of loyalties.” 535 U.S. at 171, 122 S.Ct. at 1243. The Mickens Court ultimately held that “[i]t was shorthand for the statement in
 
 [Cuyler v.] Sullivan
 
 that ‘a defendant who shows that a conflict of interest
 
 actually affected the adequacy of his
 
 |
 
 „representatio7%
 
 need not demonstrate prejudice in order to obtain relief.’ ” [Citation omitted] (emphasis added).
 
 Id.
 

 The Louisiana Supreme Court has also considered conflict of interest issues. In
 
 State v. Cisco,
 
 2001-2732 (La.12/3/03) 861 So.2d 118, the Louisiana Supreme Court acknowledged that if an actual conflict is established, a defendant need not prove
 
 *1011
 
 that prejudice has resulted from such conflict.
 
 [21]
 

 State v. Cisco,
 
 2001-2732 at p. 17, 861 So.2d at 130. If an objection is made to the claimed conflict
 
 after
 
 trial, however, the defendant must show he was actually prejudiced.
 
 Id.
 
 at n. 18 (citing
 
 State v. Tart,
 
 93-0772, p. 19-20 (La.2/9/96), 672 So.2d 116,125).
 
 [22]
 

 In this case, Defendant failed to request a change of counsel at any time; instead, he filed a pre-trial objection to the introduction of his co-defendant’s testimony at trial. Defendant makes no allegation that his trial counsel ever served two clients with conflicting interests at the same time, nor does Defendant allege that Mr. Dos-key actively participated in or shared any of his confidential or other information with Scott’s defense. Accordingly, he fails to argue that an actual conflict of interest, or a conflict affecting counsel’s perform-anee, existed.
 
 See Mickens,
 
 535 U.S. 171, 122 S.Ct. at 1243.
 

 |1sMoreover, Defendant did not request the relief he now suggests should have been granted — the removal of Mr. Cuccia as Scott’s counsel.
 
 See Holloway,
 
 435 U.S. at 489, 98 S.Ct. at 1181.
 
 [23]
 
 Because the instant objection suggesting that Mr. Cuc-cia should have been removed from representing Scott was not made until after trial, Defendant must thus establish actual prejudice.
 
 See Tart,
 
 93-0772 at 19-20, 672 So.2d at 125. The record evidences that Mr. Doskey testified that he did not discuss the case with Mr. Cuccia;
 
 [24]
 
 that he never represented any of Defendant’s co-defendants; and that he shared no information attained during his representation of Defendant. Therefore, we find Defendant’s right to a conflict free defense was
 
 *1012
 
 not violated under these particular facts and circumstances, as the record does not demonstrate any prejudice to Defendant’s defense as a result of Mr. Doske/s work with the Louisiana Capital Defense Project.
 

 ASSIGNMENT OF ERROR NUMBER 2
 

 In his second assignment of error, Defendant argues that the trial court erred in allowing the jury to hear a 911 call. The call was made by the resident in Lake Vista to whose home Ms. Smith fled after the shooting; in the call, the resident described a sixteen-year old perpetrator wearing a grey shirt and blue jeans. Defendant argues that this statement was testimonial, making the 911 tape inadmissible hearsay.
 

 In
 
 Davis v. Washington,
 
 547
 
 U.S.
 
 813, 822, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006), the U.S. Supreme Court recognized that “[statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.” Conversely, statements are considered testimonial “when the circumstances objectively indicate there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecutions.”
 
 Id,
 
 547 U.S at 822, 126 S.Ct. at 2273-4. In
 
 Davis,
 
 the Court found that statements made to a 911 operator were non-testimonial because they constituted a call for help during an ongoing threat by a caller, and the questions asked were for information necessary to resolve the present emergency.
 

 Applying the principles in
 
 Davis, supra,
 
 we find that the 911 tape was likewise nontestimonial under these particular facts and circumstances. Ms. Smith fled the crime scene in fear for her life; her companion had just been shot several times and killed; and as she fled the scene, she heard a car drive away. The 911 call was made by the occupants of a nearby home, where Ms. Smith sought refuge, but was not allowed to enter. The description of the perpetrator was plainly part of the investigation of the ongoing emergency-the realistic fear that Mr. Cacioppo’s killers might come after her. Moreover, information concerning the perpetrator or perpetrators’ description was useful information for officers responding to the Lake Vista residence in the event that more than one individual was outside the house when they arrived. Under these circumstances, the 911 call in question was admissible at trial, and this argument merits no relief.
 

 Defendant also argues that Det. Williams testified as to what a couple that was near the murder scene told him. A review of the record evidences that no objection was made during this testimony. As such, the alleged error was not preserved for appellate review. La.C.Cr.P. art. 841;
 
 State v. McDonald,
 
 414 So.2d 735 (La.1982);
 
 State v. Marshall,
 
 1999-2176 (La.App. 4 Cir. 8/30/00), 774 So.2d 244.
 

 ASSIGNMENT OF ERROR NUMBER 3
 

 In his third assignment of error, Defendant argues that his rights to compulsory process and to present a defense were violated when the trial court allowed Lakeisha Williams to invoke her own right against self-incrimination at trial. Defendant argues that Ms. Williams’ testimony could not have subjected her to criminal charges. Defendant also asserts that the trial court accepted Ms. Williams’ claim of privilege without determining whether the Fifth Amendment was applicable.
 

 Defendant argues that Ms. Williams could have rebutted Scott’s testimony,
 
 *1013
 
 wherein Scott denied driving Troy’s car and claimed that Defendant gave Ms. Smith’s backpack and the victim’s wallet to Ms. Williams; that Ms. Williams could have explained why calls were made from Ms. Smith’s cell phone to Scott’s house; that Defendant could have asked Ms. Williams about the condition of Scott’s clothes when she washed them; and that Ms. Williams could have verified that Scott told her, her mother, Reginald Williams, and Defendant that he would claim responsibility for the murder.
 

 When presented with a conflict between a defendant’s right to present a defense pursuant to the Sixth Amendment of the U.S. Constitution and a potential witness’s Fifth Amendment right against self-incrimination, the Louisiana | ⅞1 Supreme Court “has consistently recognized the witness’s right not to incriminate [herself].”
 
 State v. Haddad,
 
 99-1272, p. 5 (La.2/29/00) 767 So.2d 682, 686. This right is “confined to instances where the witness has a reasonable cause to apprehend danger from a direct answer.”
 
 State v. Coleman,
 
 406 So.2d 563, 566 (La.1981),
 
 citing Hoffman v. United States,
 
 341 U.S. 479, 487, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). Moreover, “whereas an accused may assert the privilege as an excuse for refusing to take the stand, a
 
 witness
 
 may assert the privilege only with respect to particular questions.”
 
 Coleman,
 
 406 So.2d at 566 (emphasis added). The
 
 Coleman
 
 Court noted that there are “certain unique circumstances where it is evident from the nature of the question and the position of the witness that an answer or explanation of a refusal to answer any question could result in an injurious disclosure.”
 
 Coleman,
 
 406 So.2d at 566-567.
 
 [25]
 

 In this case, at trial, Defendant’s attorney asserted that the defense did not intend to question Ms. Williams about her participation in this matter other than what she may have received from Danny Scott; that the main concern was that Ms. Williams provide truthful testimony with respect to her interaction with Scott on the night of the murder. The State noted that Ms. Williams was facing prosecution for murder in an unrelated matter, and that the State’s theory in that case was that Ms. Williams had persuaded young men to kill for her. Accordingly, the State asserted that it might be able to glean information from Ms. Williams’ testimony showing some sort of a
 
 modus operandi
 

 Det. Williams testified that Troy’s wallet was discovered in Ms. Williams’ bedroom in the house on Viola Street. He also testified that he had discovered, 12?durmg his investigation, that the wallet was placed there by Scott. Scott denied ever touching the wallet. Reginald, Ms. Williams’ brother, testified that Ms. Williams was at the Viola Street house with her boyfriend when Defendant and he arrived after the murder. Reginald pled guilty to accessory after the fact.
 

 The fact that Ms. Williams was at the Viola Street house with Defendant, Scott, and her brother immediately after the murder, that the murder victim’s wallet was found in Ms. Williams’ dresser drawer, and that she washed the clothes of Scott that night, all indicate a possibility that Ms. Williams participated in the murder as an accessory after the fact. We find that the instant case is one of the “unique instances where it is evident from the nature of the question and the position of the witness that an answer or explanation of a refusal to answer any question
 
 *1014
 
 posed could result in an injurious disclosure” by Ms. Williams.
 
 Coleman,
 
 406 So.2d at 566-567. Accordingly, the trial court correctly allowed Ms. Williams to invoke her right against self incrimination. This argument merits no relief.
 

 ASSIGNMENT OF ERROR NUMBER 4
 

 Defendant argues that the prosecution made improper remarks during closing that warrant reversal. Specifically, Defendant objects to the prosecutors’ following remarks:
 

 1. “I will not put a witness on the stand that I know to be a liar.” This statement was made in reference to Reginald Williams.
 

 2. “I don’t know I would have noticed an inch difference ...” in reference to discrepancies in Ms. Smith’s descriptions of Scott and Defendant’s heights.
 

 3. “I have never understood why the defense focused on Crystal Smith’s initial ...” in reference to discrepancies in Ms. Smith’s descriptions of Scott and Defendant’s heights.
 

 | ¾4. An assertion that probable cause hearings occur in juvenile proceedings and that probable cause was found that Scott committed murder.
 

 5. “Mr. Tony Cacioppo told me a year ago ... Troy knew how to love.”
 

 Notably, although Defendant’s counsel objected to each of these statements in the prosecution’s closing, no request to admonish the jury or request for a mistrial was made; each objection was sustained.
 

 La.C.Cr.P. Art. 774 mandates that a prosecutor’s closing argument “shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.” Arguments may not appeal to prejudice, and the State’s rebuttal is confined to answering the defendant’s argument.
 
 [26]
 

 Id,.
 
 In
 
 State v. Baylis,
 
 the Louisiana Supreme Court reasoned that when objections to improper remarks are sustained, a request for an admonition should be made:
 

 Although this Court has held that where a defendant objects to improper remarks and the objection is overruled, the defendant is not required to make a useless motion for an admonition or a mistrial to preserve his rights on appeal,
 
 State v. Hamilton,
 
 356 So.2d 1360 (La. 1978), in cases where the defendant’s objection is sustained, and the court is presumably willing to give him whatever relief to which he is entitled, there is no reason the defendant should not be required to request an admonition, if he wants one.
 

 State v. Baylis,
 
 388 So.2d 713, 720 (La.12980)(emphasis added).
 

 Because Defendant’s trial counsel objected to the prosecutor’s remarks, but never requested an admonition or mistrial, the trial court was never presented with a request for the relief now requested. Therefore, pursuant to
 
 Baylis, supra,
 
 ^Defendant cannot now claim prejudice from the trial court’s alleged failure to admonish the jury.
 

 ASSIGNMENT OF ERROR NUMBER 5
 

 In his final assignment of error, Defendant argues that the record contains insufficient evidence to support his conviction, asserting that Scott’s testimony was unreliable and that Ms. Smith’s testimony contained inconsistencies regarding the perpetrator’s height.
 

 
 *1015
 
 In reviewing sufficiency of the evidence arguments, this Court has recognized the
 
 Jackson v. Virginia
 
 standard of determining whether a rational trier of fact, in viewing the evidence in the light most favorable to the prosecution, could find the Defendant guilty beyond a reasonable doubt:
 

 In assessing the sufficiency of evidence to support a conviction, the reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 309, 99 S.Ct. 2781, 2784, 61 L.Ed.2d 560 (1979);
 
 State v. Rose,
 
 607 So.2d 974, 978-979 (La.App. 4th Cir.1992),
 
 unit denied,
 
 612 So.2d 97 (La.1993). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime.
 
 State v. Mussall,
 
 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution; it must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.
 
 Mus-sall, [supra].
 

 State v. Everett,
 
 99-1963, pp. 5-6 (La. 4 Cir. 9/27/00), 770 So.2d 466, 470,
 
 reversed on other grounds,
 
 2000-2998, 816 So.2d 1272 (La.5/14/02).
 

 Furthermore, this Court has acknowledged that a trier of fact’s determination with regard to credibility of a witness is entitled to great weight:
 

 laslt is not the function of the appellate court to reassess the credibility of witnesses or to reweigh the evidence; the reviewing court’s function is to determine the constitutional sufficiency of the evidence presented.
 
 State v. Johnson,
 
 619 So.2d 1102, 1109 (La.App. 4 Cir. 5/13/93),
 
 writ denied,
 
 625 So.2d 173 (La.10/1/93). Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the fact finder.
 
 State v. Brumfield,
 
 93-2404 (La.App. 4th Cir. 1994), 639 So.2d 312;
 
 State v. Gamer,
 
 621 So.2d 1203 (La.App. 4th Cir.1993),
 
 writ denied,
 
 627 So.2d 661 (La.1993). Moreover, conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency.
 
 State v. Jones,
 
 537 So.2d 1244, 1249 (La.App. 4 Cir.1989);
 
 Tibbs v. Florida,
 
 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness.
 
 Id.
 
 A trier of fact’s determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence.
 
 State v. Vessell,
 
 450 So.2d 938, 943 (La.1984).
 

 Id.,
 
 99-1963, pp. 8-9, 770 So.2d at 471.
 

 Finally, when the key issue is whether the defendant was the perpetrator, rather than whether a crime was committed, the State must negate any reasonable probability of misidentification.
 
 State v. Neal,
 
 2000-0674, p. 11 (La.9/21/01) 796 So.2d 649, 658. Notably, the Louisiana Supreme Court has held that a positive identification by only one witness is sufficient to uphold a conviction.
 
 Id.
 

 
 *1016
 
 In this case, Ms. Smith’s testimony was unequivocal in her recollection at trial that Defendant was the shooter, advising the jury, “I’ll never forget that face or his eyes.” Ms. Smith also insisted, in reference to Defendant, “Y’all need to know: he’s the murderer.” Ms. Smith recalled being presented with two photographic lineups, but could not recall the order of presentation by the time of trial, some six years after the incident. Det. Williams testified that on August 29, 2002, Ms. Smith identified Scott in a photographic lineup as the man who threatened her if she ran. Det. Williams testified that he presented a subsequent |2alineup to Ms. Smith while she was at work. Ms. Smith identified Defendant as the shooter during this lineup.
 

 Defendant argues that Ms. Smith was inconsistent in her identification because her recollection differed regarding the respective heights of the shooter and his accomplice. Ms. Smith originally described the shooter as 5'2" in height and approximately sixteen years old, and the non-shooter as taller and darker. At the time of his arrest, Defendant was 5'5" tall and twenty-one years old, weighing approximately 150 pounds, while Scott was 5'4" and weighed approximately 125 pounds at the time of his arrest. When asked about the discrepancy in height, Ms. Smith candidly admitted she might have erred in her estimations of heights, noting that she had difficulty in distinguishing the two individual’s complexions due to lighting. Ms. Smith admitted that she may have guessed the ages and did not know their heights. However, she explained that she will “never forget his face or his eyes.” The jury heard all of this evidence. The complained of discrepancy in heights is at most three inches, for two men who are only an inch different in height. Given the extent of this discrepancy, it cannot be said that Ms. Smith’s testimony is “rife with contradiction.” The jury’s apparent determination that Ms. Smith was a credible witness does not clearly contradict the evidence.
 

 Upon a careful review of the record, we find Defendant’s assertion that Scott’s testimony was unreliable lacks merit. Scott admitted at trial that he had entered a plea agreement with the State in exchange for his testimony; his testimony was not clearly controverted by the evidence and his credibility remained clearly within the jury’s purview.
 
 See State v. Vessell,
 
 450 So.2d 938, 943 (La.1984).
 

 b7CONCLUSION
 

 For the aforementioned reasons, the conviction and sentence are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . With regard to Danny Scott, Ms. Smith testified that after the first shot, Scott demanded money from Ms. Smith. Ms. Smith became angry and cursed in response. Ms. Smith observed that Scott's body movement indicated he did not want to be involved in the situation, especially after the first shot.
 

 [2]
 

 . Dr. William P. Newman, III, the coroner pathologist who conducted the autopsy on Troy Cacioppo's body, also testified at trial. According to his testimony, Troy suffered two gunshot wounds — one to the neck and one to the left flank. He died from the neck wound. However, the flank wound ''complicated” the fatal injury. Troy also suffered extensive hemorrhaging in the neck and fractured cervical vertebrae at C-4 and C-5. The bullet entering the flank creased the kidney, causing extensive hemorrhaging in that area. All of these injuries contributed to Troy's death. Dr. Newman explained that there may have been a chance of surviving the first gunshot wound. A neurologist would have to make that determination. However, the second gunshot wound eliminated any such chance of survival. Dr. Newman removed a bullet from the cervical vertebra and several chain fragments from the neck. This evidence was introduced at trial.
 

 [3]
 

 .At trial, Kathy Robertson authenticated a recording of an August 28, 2002 emergency 911 call, which was played for the jury over the defense’s objection.
 

 [4]
 

 . Officer Carl Palmer, of the New Orleans Police Department's Crime Lab, testified that he arrived at the crime scene at approximately 4:30 a.m. on August 22, 2002, and processed the scene on Lakeshore Drive. Officer Palmer took photographs of the scene and recovered the following physical evidence: a spent casing from a .380 automatic and a silver colored medallion of Jesus with a glass stone in it. A sketch of the scene was also drawn. Sergeant Robert Blanchard, also of the New Orleans Police Department, testified at trial that a projectile was the only physical evidence remaining in this case after Hurricane Katrina.
 

 [5]
 

 . Ms. Smith further testified, "Y’all need to know: he's the murderer.”
 

 [6]
 

 .Sergeant Danny Scanlan also testified at trial. At approximately 3:40 a.m. on August 28, 2002, Sergeant Scanlan was dispatched to Stilt Street, in the Lake Vista area. There, a distraught young woman — Crystal Smith-related that a robbery and shooting had occurred at the lakefront. He and Ms. Smith drove to the lakefront, where a shell casing and a medallion-like piece of jewelry were discovered by the seawall. A green car they were looking for was not there. Sergeant Scanlan walked down to the water and saw something bobbing, and discovered that it was the body of Ms. Smith's companion. Sergeant Scanlan recalled that Mr. Cacioppo had a dragon tattoo on his chest and a tattoo that said "Little Troy” on his right arm. Once homicide detectives arrived, Sergeant Scanlan returned to patrol.
 

 [7]
 

 . Yolanda Bradshaw, Troy Cacioppo’s mother, testified at trial that Troy owned a green Grand Prix that was in very good condition.
 

 [8]
 

 . Sylvia Mena testified at trial; she and Troy Cacioppo have a son together, Troy Cacioppo, Jr. On the evening of August 27, 2002, Troy and Ms. Mena spoke at approximately 5:00 or 6:00 p.m., at which time Troy indicated that he wanted to pick up Troy, Jr. so they could work on Troy’s car together. Arrangements were made for Troy to pick up Troy, Jr., but Troy never appeared. Ms. Mena received a call from Ms. Bradshaw on the morning of August 28, 2002, informing her of Troy’s passing.
 

 Ms. Mena identified Troy's car in several pictures. She explained that Troy kept the
 
 *1005
 
 vehicle in perfect condition. The vehicle was in that condition when she saw it the Saturday before Troy’s passing. However, the car in the pictures presented at trial showed a car that was scratched and dirty and from which the rims had been removed. Ms. Mena had no personal knowledge of the circumstances under which the car descended into the condition depicted in the photographs.
 

 [9]
 

 . Scott identified Defendant in court, as well as a photograph of the victim.
 

 [10]
 

 . Scott denied saying anything to the female stranger or threatening her, insisting that he only told the male stranger that he did not have any marijuana.
 

 [11]
 

 . Scott testified that Williams attempted to remove the hubcaps, but the screws stripped.
 

 [12]
 

 . Scott was arrested for first degree murder.
 

 [13]
 

 . Both of Scott's parents were present at the police station after his arrest. He testified that he spoke to them alone both prior to and after giving his statement.
 

 [14]
 

 .Scott entered into a plea agreement that was recorded during his June 13, 2008 guilty plea proceedings. The agreement required that he tell the truth and
 
 not testify
 
 regarding anything that he had not said in his statement. Scott had a prior conviction for simple robbery.
 

 [15]
 

 . Williams testified that Scott and Defendant did not know each other before the night of the murder.
 

 [16]
 

 . Scott entered an agreement to testify for the state in exchange for a reduced charge and sentence on June 13, 2008.
 

 [17]
 

 .Rule 1.9 provides:
 

 (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person’s interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.
 

 (b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
 

 (1) whose interests are materially adverse to that person; and
 

 (2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.
 

 (c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter: (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or
 

 (2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.
 

 [18]
 

 . An error is harmless if there is no reasonable possibility that it might have contributed to the conviction and that the error is harmless beyond a reasonable doubt.
 
 Chapman v. California,
 
 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967);
 
 State v. Gibson,
 
 391 So.2d 421 (La. 1980).
 

 [19]
 

 . Similarly, the Louisiana Supreme Court determined that an alleged violation of the Rules of Professional Conduct by a prosecutor should not result in the quashing of an indictment. In
 
 State v. Walker,
 
 the Court denied a motion to quash, pretermitting whether evidence obtained by a prosecutor in violation of the Rules of Professional Conduct should be suppressed.
 
 State v. Walker,
 
 567 So.2d 581, 587 (La. 1990). Notably, in a concurrence, Justice Marcus stated, “[e]ven assuming that [the prosecutor] violated the Rules of Professional Conduct prohibiting contact between a lawyer and a party represented by another attorney, I am doubtful that suppression of the evidence would be an appropriate sanction where no constitutional violation occurred.”
 
 Id.
 
 at 587-588.
 

 [20]
 

 .
 
 Glasser [v. United States,
 
 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942)] established that unconstitutional multiple representátion is never harmless error. Once the Court concluded that Glasser’s lawyer had an actual conflict of interest, it refused "to
 
 *1010
 
 indulge in nice calculations as to the amount of prejudice” attributable to the conflict. The conflict itself demonstrated a denial of the "right to have the effective assistance of counsel.” 315 U.S. at 76, 62 S.Ct., at 467. Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.
 
 See Holloway, supra,
 
 435 U.S., at 487-491, 98 S.Ct., at 1180-1182. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.
 
 See Glasser, supra,
 
 315 U.S., at 72-75, 62 S.Ct., at 465-467.
 

 Cuyler v. Sullivan,
 
 446 U.S. at 349-350, 100 S.Ct. at 1719 (emphasis added).
 

 [21]
 

 .The issue of conflicting loyalties usually arises in the context of joint representation, but it can also arise "where an attorney runs into a conflict because he or she is required to cross-examine a witness who is testifying against the defendant and who was or is a client of the attorney.”
 
 State v. Tart, 93-0772,
 
 p. 19 (La.2/9/96), 672 So.2d 116, 125;
 
 State v. Kirkpatrick,
 
 443 So.2d 546, 552 (La. 1983). In a pretrial context, regardless of how the conflict of interest issue arises, the trial court has two options to avoid a conflict of interest; appoint separate counsel or take adequate steps to ascertain whether the risk of a conflict of interest is too remote to warrant separate counsel.
 
 Tart,
 
 93-0772 at 19-20, 672 So.2d at 125 (relying on
 
 Holloway
 
 v.
 
 Arkansas,
 
 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978));
 
 State v. Edwards,
 
 430 So.2d 60, 62 (La.1983);
 
 State v. Marshall,
 
 414 So.2d 684, 687-88 (La. 1982). Failure to do one or the other in a case in which an actual conflict exists requires reversal.
 
 Holloway,
 
 435 U.S. at 480, 98 S.Ct. at 1181;
 
 State v. Cannouche,
 
 508 So.2d 792, 805 (La. 1987) (on
 
 reh
 
 'g). As we stated in
 
 [State v.] Franklin,
 
 400 So.2d [616,] 620, "If an actual conflict exists, there is no need for a defendant to prove that he was also prejudiced thereby.”
 

 State v. Cisco,
 
 2001-2732 at p. 17, 861 So.2d at 130.
 

 [22]
 

 . The Court did not address
 
 Mickens.
 

 [23]
 

 . As in
 
 Glasser, supra,
 
 the trial court in this case was made aware of the alleged conflict in the Motion in Limine, but was never presented with a request for relief from the alleged joint representation.
 

 [24]
 

 . Mr. Doskey testified at a July 30, 2008 pretrial hearing on Defendant’s Motion in Li-mine. This testimony reveals that Mr. Doskey worked at the Orleans Indigent Defenders Program ("OIDP”) from 1978 or 1979 until the fall of 2006. Thereafter, Mr. Doskey worked for the Capital Defense Project of Southeast Louisiana, which is headed by Kerry Cuccia. While working for OIDP, Sonny Armond and Mr. Doskey represented Defendant in this case. When Mr. Doskey went to work for the Capital Defense Project, he and Mr. Cuccia agreed that they would not communicate regarding their respective clients. Mr. Doskey testified that although no specific steps were taken to ensure that Mr. Cuccia and Mr. Doskey would not have physical access to each others' files for this matter, the two men acted based on honor.
 

 [25]
 

 . It is also impermissible for a defendant to call a witness for the sole purpose of having him or her claim the privilege in front of a jury.
 
 Haddad,
 
 99-1272 at p. 5, 767 So.2d at 686.
 

 [26]
 

 . It is noteworthy that La.C.Cr.P. art. 774 contains no sanction for violations.
 
 See
 
 La. C.Cr.P. art. 774, Comment (c).